## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CLAUDE M. PENN JR., individually and on behalf of all others similarly situated,

        Plaintiff,

        v.

JP MORGAN CHASE & CO., JEFFREY T. CONRAD, JOHN B. OHLE, III, SCOTT D. DEICHMANN, and BARBARA DAIGLE,

        Defendants.

*Judge Pauley*

Civil Action No:

**05 CV 5481**

**JURY TRIAL DEMANDED**



RECEIVED
JUN 0 9 2005
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, allege the following based upon the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, IRS notices and announcements disallowing certain tax shelters, documents obtained by the IRS from JP Morgan Chase & Co. and Jenkens & Gilchrist, P.C., relating to certain tax shelters entered into between Plaintiff and Bank One Corporation, and media reports related to the tax shelters at issue.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this suit as a civil enforcement action under 18 U.S.C. §§1961-1968, §901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in

particular, under 18 U.S.C. §1964 and other causes of action as set forth hereafter.

2.    Plaintiff brings this action against JP Morgan Chase & Co. as the successor in interest to Bank One Corporation, and Bank One Corporation's wholly owned subsidiary, Banc One Investment Advisors Corporation ("BOIA"), and certain of BOIA's employees,  for soliciting and inducing their clients to participate in tax strategies even though Defendants knew or recklessly disregarded the fact that the federal government had previously found these types of tax strategies to be illegal tax shelters.

3.    The Defendants entered into various arrangements amongst themselves and their co-conspirators to market and promote certain tax strategies to high net-worth individuals and business entities in order to generate hundreds of millions of dollars in fees.  The Defendants arranged to solicit high net-worth participants, like Plaintiff, who were induced to engage in the illegal tax shelters and pay the Defendants and their co-conspirators exorbitant fees by misrepresentations and advice that the Defendants knew were improper and illegal.

4.    Plaintiff seeks disgorgement of all excessive and illegal fees paid to the Defendants, plus compensation for all other damages sustained, including without limitation all fees and costs Plaintiff, and all others similarly situated, will incur responding to the federal and state tax agencies as a result of the Defendants' actions, and any additional amounts, such as taxes, interest, and penalties, that may be assessed by the federal and state tax agencies, all of which damages must be trebled under RICO.

5.    As described in more detail below, the Defendants abused their fiduciary positions of trust in order to generate exorbitant fees for themselves by advising their clients to engage in illegal tax strategies.  Defendants represented the tax strategies as being new and unique and, as

such, not substantially similar to transactions that had been deemed abusive by the Internal Revenue Service ("IRS"). To the contrary, the Defendants knew that the tax strategies they were advising their clients to enter into were similar to prior strategies found abusive by the IRS and that, as a result, it would be, if detected, intensely scrutinized and ultimately ignored and disallowed by the tax authorities.

6.    Among other things, the Defendants and their co-conspirators colluded in order to induce the Defendants' clients to engage in these tax strategies by unequivocally representing that the tax strategies had been vetted by major law firms and were lawful, by representing that these same law firms would provide legal opinions that attested to that characterization, and by assuring the clients that the legal opinions provided protection against penalties that the tax authorities could assess in the unlikely event that they challenged the tax strategies' legitimacy. This advice has proven disastrous for Defendants' clients, in that they have paid a significant amount of fees to the Defendants only to receive erroneous and incompetent advice that has caused them to be threatened with the assessment of substantial additional taxes, plus interest and penalties and has caused them to pay substantial amounts to rectify the misconduct of the Defendants.

## II.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1964(a) and 1964(c), and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8.    Venue lies in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the principal executive offices of JP Morgan Chase & Co. are located in New York, New

York. In addition, this Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(b) because one or more Defendants reside, may be found, has an agent, or transacts its affairs in this District.

### III.    THE PARTIES

**Plaintiff**

9.      Plaintiff Claude M. Penn Jr. is a resident of Denham, Louisiana, and was a client of Bank One Corporation, and was induced to enter into an illegal tax shelter by certain BOIA employees. Plaintiff suffered damages as a result of the wrongs complained of herein.

**Defendants**

10.     Defendant J.P. Morgan Chase & Co. ("JPMorgan") is a financial holding company incorporated under Delaware law in 1968. JPMorgan Chase is one of the largest banking institutions in the United States, with more than $1 trillion in assets and operations in more than 50 countries. On July 1, 2004, Bank One Corporation merged with and into JPMorgan. Because the wrongdoing occurred between Plaintiff and Bank One Corporation, and one or more of its wholly-owned subsidiaries, before its merger with JPMorgan, hereinafter JPMorgan will be referred to as "Bank One."

11.     Defendant Jeffrey T. Conrad ("Conrad") is an attorney and certified public accountant and was at all relevant times hereto a member of Bank One's Innovative Strategies Group ("ISG") located in Chicago, Illinois. ISG provided tax and estate planning services through Bank One's wholly owned subsidiary, BOIA. At all relevant times hereto, ISG operated through branch departments located throughout the United States.

12.     Defendant John B. Ohle, III ("Ohle") is a tax attorney and was at all relevant times

hereto Regional Director of ISG located in Chicago, Illinois. Ohle attended marketing meetings and advised Bank One clients, including Plaintiff, to enter into illegal tax shelters.

13.    Defendant Scott D. Deichmann ("Deichmann") was at all relevant times hereto a member of ISG located in Chicago, Illinois. Deichmann attended marketing meetings and advised Bank One clients, including Plaintiff, to enter into illegal tax shelters.

14.    Defendant Barbara Daigle ("Daigle") was at all relevant times hereto Director of ISG for the Louisiana and Florida markets. Daigle, who joined Bank One in 1997 as a trust consultant, was a tax senior manager for KPMG, a nationally recognized accounting firm. Daigle attended marketing meetings and advised Bank One clients, including Plaintiff, to enter into illegal tax shelters.

## IV.    CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action on his own behalf and, pursuant to Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of himself and the nationwide class of all persons (the "Class Members" or the "Class") defined below against all Defendants:

All Persons who, from December 27, 1999, through December 31, 2003, inclusive, either: (1) entered into tax strategies involving private contracts with Deutsche Bank AG, Deutsche Bank Securities Inc., and/or Deutsche Bank Alex Brown, and who consulted with, relied upon, or received opinions or advice from, or in which fees were received by, Bank One Corporation, or any of Bank One Corporation's wholly owned subsidiaries; or (2) filed with a Person described in (1) a joint tax return for the year(s) in which such tax strategies described in (1) were implemented; and (3) the legal representatives, heirs, successors, and assigns of all Persons described in (1) and (2).

The "Class" includes, without limitation, the individuals, partnerships, limited liability companies, trusts, corporations, and other legal entities that Bank One Corporation, or any of Bank One Corporation's wholly owned subsidiaries, advised concerning, that were formed in connection with, or that engaged or were utilized in any one or more of the tax strategies described in (1).

16.    This action is properly maintainable as a class action because:

a.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members are unknown by Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, over a hundred members of the Class;

b.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class Members suffered similar harm and damages as a result of Defendants' systematic unlawful and wrongful conduct described herein;

c.    Plaintiff is a representative party who will fairly and adequately protect the interests of the Class Members and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

e.    Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other Class Members, such as joint tax filers or joint owners of a particular entity that purchased tax strategies from the Defendants, who are not parties to the action or could substantially impair or impede their ability to protect their interests;

f.    Defendants' conduct affected and affects all Class members in a similar

manner making final relief to the Class as a whole appropriate; and

        g.      Failure to permit this action to proceed as a class action would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions, and would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

      17.     The questions of law and fact common to the Class Members predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

        a.      Whether Defendants engaged in a pattern of racketeering activity in violation of RICO;

        b.      Whether Defendants knew about or recklessly disregarded IRS official notices that prohibited or disallowed the tax strategies sold by the Defendants;

        c.      The nature of the fiduciary duties Defendants owe or owed to members of the Class;

        d.      Whether Defendants breached their fiduciary duties;

        e.      Whether Defendants knew or recklessly disregarded the fact that the transactions they caused Plaintiff and the Class members to enter into had no business purpose and no economic substance; and

        f.      The extent of losses sustained by members of the Class and the appropriate measure of relief.

18.     Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## V. THE SCHEME TO DEFRAUD UNSUSPECTING CLIENTS

### A. Bank One and its Co-Conspirators

19.     Bank One, at all relevant times acted through its wholly owned corporation, BOIA.

20.     BOIA is a nationally recognized investment manager with extensive experience managing money for a broad range of clients, from institutional investors, to middle market business owners, to affluent individuals.

21.     ISG, a division of BOIA, is a group of tax professionals who provide tax and estate planning services to BOIA clients.  Defendants Conrad, Ohle, Deichmann, and Daigle were all members of ISG and advised their clients, including Plaintiff, to enter into the illegal tax shelters.

22.     Jenkens & Gilchrist, a Professional Corporation ("J&G"), is a large nationally recognized law firm.  The firm concentrates its practice in many areas of law, including Corporate & Securities, Estate Planning, and Tax.

23.     Paul M. Daugerdas ("Daugerdas") is an attorney and certified public accountant and at all relevant times hereto was a shareholder of J&G and headed J&G's structured investment practice and tax and estate planning practice.

24.     Deutsche Bank AG ("Deutsche Bank") is a company principally dedicated to financing foreign trade and offers various investment, financial, and related products and services to consumer and corporate clients worldwide.

## B. The Formation of the Scheme to Defraud

25.    The plan to market and sell the tax strategies at issue was originally created by individuals at Deutsche Bank and Daugerdas.  Deutsche Bank acted as a strawman, creating contracts on paper, purporting to be private options contracts entered into between Deutsche Bank and the client.  The Deutsche Bank contracts were created by Deutsche Bank at the direction of J&G and others.  Deutsche Bank was paid substantial fees for each set of contracts it created and entered into, while Deutsche Bank suffered no risk of loss for entering into the contracts.  For every contract entered into between Deutsche Bank and the client, the resulting risk established by the initial contract was eliminated by a reciprocal contract simultaneously entered into between Deutsche Bank and the client.  Each set of contracts were designed to result in a loss, and therefore, Deutsche Bank, after creating and entering into the contracts with the client, immediately gained a profit.  All of the contracts written by Deutsche Bank were "sham" contracts with no business purpose or economic substance and were used to cause unsuspecting clients to believe that they were entering into a legitimate, possibly profitable, deal with a third party.  The contracts were nothing more than documents used to create an aura of legitimacy to the tax strategies being sold.  Each contract stated a premium that was purportedly paid by the client for entering into the contract.

26.    Clients were advised that by entering into a series of sophisticated transactions, they were entitled to deduct these stated premiums in the contract, even though, the net out-of-pocket amount that was actually paid by the client and received by Deutsche Bank was substantially less than the stated premiums.

27.    Clients were led to believe that the implementation of the tax strategies was highly sophisticated and expensive. J&G required Defendants' clients to sign a confidentiality agreement concerning the "financing structures developed by J&G." The clients had to agree that they "shall not develop, use or market products or services similar to or competitive with the Structures and/or Confidential Information." Because of the confidentiality of the tax strategies, clients were required to agree that they would not disclose the strategies to any third party without prior approval by J&G.

28.    J&G, Daugerdas, and Deutsche Bank recruited Bank One, and other banking, accounting, and law firms, to assist them in marketing the illegal tax shelters.

29.    J&G, Daugerdas, and Deutsche Bank used banking, accounting and law firms to market the illegal tax shelters because wealthy clients rely on, and place a tremendous amount of trust and faith in, the advice and recommendations of their attorneys, accountants, and advisors. As a result, J&G, Daugerdas, and Deutsche Bank knew that law, accounting, and banking firms had an established market for the illegal tax shelters and knew that if these firms recommended the illegal tax shelters as "sophisticated gain elimination strategies" to their wealthy clients, the clients would more than likely do the deal without questioning the details of the particular strategy.

30.    J&G, Daugerdas, Deutsche Bank, and Bank One entered into an arrangement where each would receive a certain portion of the fee for each tax transaction sold. Bank One, and the other marketing participants, were eager to participant in marketing the illegal tax shelters because the fee potential was extraordinary. The fees were not based on an hourly rate or time spent working on the deal; rather, the fees were based solely on "the size" of the transaction.

In other words, the bigger the deal, the larger the fees shared by Bank One and its co-conspirators. Thus, Bank One, and the other marketing participants, had a motive to sell as many tax shelters as possible, as large as possible.

31.    After time, Bank One not only marketed the tax strategies created by Deutsche Bank and Daugerdas, but it became a significant player in the implementation of the tax strategies. Bank One and its co-conspirators originally used partnerships to hold the private option contracts and generate sham losses for its clients, however the IRS detected the partnership scheme and issued tax notices (described below) declaring that the losses generated from this scheme were artificial and not deductible for income tax purposes. Bank One and its co-conspirators then started to use trusts to implement the illegal tax strategies. In particular, Bank One used its wholly owned subsidiary, American National Bank & Trust Company of Chicago, to set up trusts to transfer the private option contracts to and generate artificial losses. American National Bank & Trust Company of Chicago would later send tax documents to its clients detailing the losses and directing the clients to deduct the losses on the clients' personal income tax return.

32.    Bank One and its co-conspirators favored the use of trusts because the American National Bank & Trust Company of Chicago reported its clients' losses to the IRS on 1099 forms, creating the appearance that an independent third party calculated the losses that the taxpayers ultimately deducted for income tax purposes. In addition, these 1099s provided little or no description of the losses generated by the trusts, further decreasing the chances that the IRS would discover that these deductions were derived from the same artificial losses generated from the partnership based tax schemes that it previously declared illegal.

33.     In addition to the substantial fees paid to J&G (who kicked back a portion of these fees to Bank One), clients paid American National Bank & Trust Company of Chicago significant fees for establishing the trusts used to implement the tax strategies.

34.     On October 13, 2004, a *New York Times* article, reported that, documents from a class action lawsuit against J&G for selling the illegal tax shelters at issue, according to people who have seen the documents, revealed that J&G's "tax practice, led by Mr. Daugerdas, generated $267 million in fees from its work on tax shelters...." The article went on to state that "[o]f the $267 million, $83 million went to the firm [J&G]. Another chunk went to Mr. Daugerdas and two other lawyers at the firm. Nearly $50 million went to the financial and accounting firms that carried out the complex financial transactions for the shelters."

### C. The Defendants Market the Illegal Tax Shelters

35.     The Defendants identified potential wealthy existing clients and set up meetings to discuss the tax strategies.  Bank One also solicited buyers of the illegal tax strategies through business magazines and newspapers.  For example, in a *Utah Business* article, dated June 1, 2001, a money manager for private banking services at Bank One, boasted that many of her clients "are entrepreneurs who are likely to need special services as a result of emerging into wealth after selling their businesses." The article went on to state "Bank One's Innovative Strategy Group, with its tax specialists, can also create sophisticated gain elimination strategies and set up asset management entities such as family limited partnerships and charitable remainder trusts."

36.     The Defendants, capitalizing on their close relationship with existing clients and Bank One's highly regarded reputation with regard to new clients, set up meetings to discuss the

tax strategies and give sales presentations. The Defendants' role in the scheme was not limited to investment advice. To the contrary, the Defendants discussed all aspects of the tax strategies with their clients, including the alleged tax benefits of the strategies and some even held themselves out as tax experts.

37.     Plaintiff and the Class members were told that by entering into certain options contracts and then entering into a series of sophisticated transactions, they could possibly obtain a gain or a loss, but that any loss would be substantially outweighed by the tremendous tax savings generated by the transactions.

38.     The crux of the standard sales pitch was always that a major law firm (i.e., J&G) would prepare an "independent" opinion letter confirming the propriety of the tax strategies, which would supposedly provide insurance in the event of an audit.

39.     Plaintiff and the Class Members were led to believe that they were receiving unique, individualized advice and that the implementation of the tax strategies were complex and time consuming, and thus, expensive. The greater the size of the transaction, the more it would cost to implement the transaction.

40.     However, unbeknownst to Plaintiff and the members of the Class, Defendants and their co-conspirators were implementing the tax strategies on a mass scale. Most, if not all, of the paperwork and contracts used to set up the entities needed to implement the tax strategies were boilerplate and only needed to be updated with a particular client's information.

41.     In addition, unknown to Plaintiffs and the Class Members, J&G and Daugerdas prepared an opinion letter opining as to the propriety of its tax strategies long before the Defendants began to solicit their clients. The opinion letter was a "canned," "prefabricated" form

that was utilized, with minor changes based on the particular client, for each and every strategy sold across the country.

42.    None of the Defendants ever told Plaintiff or the Class members that the strategies were actually created and designed by J&G, Daugerdas, Deutsche Bank, and Bank One and that the private options contracts arranged with Deutsche Bank were "sham" contracts, with Deutsche Bank acting as a strawman.

### D. The Illegal Tax Shelters

43.    All of the tax shelters were identical with slight variations regarding the types of entities, S-Corporations, Trusts, Partnerships, etc., used to accomplish the transactions and slight variations with respect to the contracts created by Deutsche Bank.  Defendants and J&G used variations to avoid detection by the IRS.  Also, when the IRS issued official notices disallowing particular tax strategies, Defendants and J&G would change the tax strategies being sold so that if the schemes were detected by the IRS, they could argue that prior IRS notices did not apply to the "new" tax strategies because, for example, the strategies involve trusts instead of partnerships.

44.    First, Defendants and their co-conspirators arranged for Deutsche Bank to draft a set of "sham" private options contracts, with Deutsche Bank acting as the counter party to the contracts.  One method Defendants used to entice skeptical clients to enter into a tax strategy was to claim that the private contracts between the client and Deutsche Bank may in fact turn out to be very profitable or may produce an out-of-pocket loss, but that any out-of-pocket loss would be greatly outweighed by the resulting tax benefits from the tax strategy.  Next, Deutsche Bank would have the client sign the contracts.  Because of the complexity of the contracts, the clients

would not know that the contracts that they were entering into and paying for would not result in any profit.

45.    After the private contracts were arranged by J&G and Deutsche Bank, and the client signed the contracts, the Defendants or J&G would create an entity for the client (possibly a partnership, a S-Corporation, or a trust) and cause the client to transfer the private contracts to the entity.  Next, the Defendants or J&G would cause the entity to engage in a pre-determined set of non-arms-length transactions with other entities established by Bank One and its co-conspirators.

46.    The Defendants and J&G would intentionally create layers of transactions to keep the tax shelter complex and difficult for the IRS, if not impossible, to detect.  For instance, a *Chicago Lawyer* article, published in its May 2004 edition, stated that a U.S. assistant attorney investigating J&G's questionable tax shelters on behalf of the IRS had to request an order from the court that J&G produce a list of all the clients that used the tax shelter because "the clients are nearly impossible to find without Jenkens' cooperation."

47.    The end result of a particular tax strategy is that the client is left with a substantial "paper" loss.

48.    The Defendants advised their clients that the losses created by the strategies were legitimate and in accordance with all applicable tax laws, rules, and regulations.  In particular, the Defendants advised their clients that the strategies were not a "sham transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letter from J&G would confirm this.

49.    Finally, the Defendants advised their clients that if the IRS audited their tax

returns as a result of the strategies, J&G's "independent" opinion letter would confirm the

propriety of the strategies and of claiming the resulting losses on their tax returns. As noted,

J&G had already prepared the "canned" and "prefabricated" opinion letters approving the

strategies, and needed only to fill in several blanks for each of the many clients to which they

rendered such opinion letters.

### E. Defendants Knew or Recklessly Disregarded the Fact That the Tax Strategies Were Illegal

50.    It is well known by tax professionals that under the Federal tax law, losses

pursuant to "sham transactions" are not losses for tax purposes. The basic rule of law is that

taxation is based upon substance, not form, and any loss deductible for tax purposes must be an

actual loss.

51.    Defendants knew or recklessly disregarded the fact that the Deutsche Bank

contracts were sham contracts designed to create a loss and that if their clients used these

contracts as a basis to claim a loss for income tax purposes, the resulting tax deduction would be

improper and in direct violation of Federal tax laws.

52.    Defendants and their co-conspirators relied on the complexity of the tax strategies

with the hope that the IRS would not detect the illegality of the transactions. However, the IRS

discovered the trend of illegal tax shelters being marketing and sold throughout the country.

53.    On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax

Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS stated:

> The Internal Revenue Service and Treasury Department have
> become aware of certain types of transactions as described below,
> that are being marketed to taxpayers for the purpose of generating
> tax losses. This notice is being issued to alert taxpayers and their
> representatives that the purported losses arising from such

transactions are not properly allowable for Federal income tax purposes. . . .A loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. . . .Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes.

54.    The clear message from the IRS to Defendants was that a loss arising from "a contrived series of steps" in which a taxpayer did not actually suffer the loss, will not be allowable for income tax purposes.  The Defendants completely failed to discuss and analyze the effect and significance of this IRS notice on the tax strategies sold to their clients.

55.    As a result of Notice 1999-59, the Defendants knew or recklessly disregarded the fact that, if discovered, the IRS would declare that the purported losses arising from the tax strategies they were marketing and selling were improper and not allowable for tax purposes because the loss was an "artificial loss lacking economic substance" generated "through a contrived series of steps;" however, the Defendants intentionally did not disclose this information to Plaintiff and the Class Members and, indeed, told them the exact opposite.

56.    In August 2000, the IRS once again clearly and unequivocally informed tax professionals across the country that they believed the strategies such as those marketed and sold by Defendants were improper.  Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis."  This Notice concerned "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the strategies described herein in Notice 1999-59.

57.    Most importantly, Notice 2000-44 specified some of the precise transactions

marketed by the Defendants and their co-conspirators, under which the taxpayer purchases option contracts and simultaneously writes offsetting option contracts, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] § 752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated, "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to Defendants was that non-economic tax losses arising from the current trend of entering into opposing option contracts and subsequently engaging in a series of pre-determined transactions are not properly allowable for Federal income tax purposes. These Defendants, however, simply ignored the IRS and this notice to the detriment of Plaintiff and the Class.

58.     There is no doubt that Defendants, most who have extensive experience in the field of taxation, knew or recklessly disregarded the fact that, as a result of IRS Notices 1999-59 and 2000-44, the purported losses arising from their clients participation in the tax strategies at issue would, if tracked down by the tax authorities, be disallowed for Federal or State income tax purposes; however, the Defendants intentionally failed to inform their clients of this fact.

59.     The Defendants represented that the tax strategies at issue herein were legal tax shelters despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that these types of transactions that Plaintiff and the Class Members undertook, based on the advice and recommendation of Defendants, were illegal. The Defendants simply ignored the clearly stated implications of IRS Notice 1999-59 and IRS Notice 2000-44 and, therefore,

knowingly deceived and misled Plaintiff and the Class members to their detriment.

60.    According to the December 2004 issue of *The American Lawyer*, in 2002, the IRS began serving summonses to promoters of suspected illegal tax shelters, including J&G. J&G eventually disclosed to the IRS all of its clients that participated in tax strategies involving offsetting options contracts. Bank One and Deutsche Bank received similar requests from the IRS at about the same time that J&G was served its summons or shortly thereafter.

61.    The Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to their clients confirming the propriety of the strategies at issue.

### F. Defendants Caused Their Clients to Enter into Tax Shelters Which They Knew Were Illegal

62.    The Defendants continued to promote and implement the strategies after Notice 2000-44 was issued expressly stating that these types of transactions, transactions involving the use of offsetting options contracts, were illegal and invalid. The Defendants knew that the IRS was aware of these types of transactions and that, if discovered, the IRS would disallow the losses, and impose substantial penalties. The Defendants did not disclose this important development to their clients because the Defendants knew their clients would refuse to participate in the strategies and ask for a return of their fees. Instead, Defendants made slight variations to the tax strategies to avoid detection by the IRS, or if detected, so that they could argue that the IRS's prior notices did not apply to these new tax strategies. For instance, instead of using partnerships to implement the tax strategy sold to Plaintiff, the Defendants arranged Bank One's wholly owned subsidiary American National Bank & Trust Company of Chicago to set up a trust and used the trust to implement the tax strategies.

63.    At no time prior to or subsequent to the implementation of the tax strategies at

issue did Defendants inform their clients that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the Defendants were therefore illegally promoting an unregistered tax shelter by marketing the strategies. The Defendants failed to inform their clients of these facts and, in fact, advised them to the contrary.

64.     Between the time the Defendants advised their clients to enter into the strategies at issue and the time their clients' respective tax returns were prepared, signed and filed, the Defendants never disclosed to their clients the significance of IRS Notice 1999-59 and IRS Notice 2000-44 or that the tax strategies were in direct violation of Federal tax laws. The Defendants failed to advise their clients that the strategies lacked a business purpose and economic substance and, in fact, advised them to the contrary. Defendants intentionally failed to disclose this material information to their clients.

65.     As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the Defendants and their co-conspirators knew or recklessly ignored, before issuing the Opinion Letters, and before their clients filed their tax returns, that the IRS would probably track down every "sham" tax strategy sold by Defendants and their co-conspirators and declare that the purported losses arising from the strategies were not properly allowable for Federal or State income tax purposes. However, the Defendants intentionally failed to inform their clients of this and, indeed, informed them to the contrary.

66.     The Defendants and their co-conspirators conspired to devise and promote the strategies at issue for the purpose of receiving and splitting millions of dollars in fees. The receipt of those fees was the primary, if not sole, motive in the development and execution of the

tax transactions. Further, the amount of fees earned by the Defendants was not tied to or reflective of the amount of time and effort they expended in providing financial services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns. Indeed, Defendants and their co-conspirators devised the transaction and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the strategies at issue by agreeing to the representations that would be made and issuing the allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

### G. Bank One Targets its Own Clients

67.    Bank One, through its banking employees, identified potential clients based on their knowledge of its clients' finances. The clients then became "targets."

68.    For example, according to documents Plaintiff received from Bank One, on December 12, 2001, Defendant Daigle, from ISG's Louisiana branch, sent an e-mail to ISG employees in Illinois, who included Defendants Conrad, Ohle, and Deichmann, seeking advice from Defendant Conrad on the total amount of fees to be divided among the various parties. She stated the "total fees were around $700,000 per a discussion Troy (he owns the relationship) had with Plaintiff. From a prior discussion with John [Ohle], the portion to the Bank is $180,000...." The "Troy" mentioned in this e-mail is Troy D. Hebert, who is a financial advisor in Bank One's Middle Market Bank group. The e-mail went on to state that the Middle Market Bank group of Bank One is supposed to receive revenue credit for the transaction and Daigle also stated "I would like clarification on the amount of transaction revenues to be credited against my ISG

sales goals." Daigle, a member of ISG Louisiana, was part of the ISG marketing team sent to advise Plaintiff to enter into the tax strategies.

69.    As evidenced by the above e-mail, Bank One had a system in place which provided Bank One financial advisors with fees for advising their private banking clients to enter into the tax strategies at issue.

70.    Bank One financial advisors contacted their private banking clients and made one or more presentations to them. The Bank One financial advisor would then set up additional meetings to allow Deutsche Bank, J&G, and Bank One's ISG members to meet with the "targets." During these meetings, Deutsche Bank, along with J&G and certain ISG members, would each promote and market the strategies at issue as a completely legitimate tax-savings strategy that also allowed the client the opportunity to make a significant profit on the investment. The Defendants would each assure the "target" that a major law firm would prepare an "independent" opinion letter confirming the propriety and legality of the strategies. The Defendants and their co-conspirators touted the reputations of Jenkens, Deutsche Bank, and Bank One as a means to assure the "target" that the strategies were completely legal. The Defendants would not disclose the fact that the tax strategies were created, designed, and implemented by Daugerdas, Bank One, and Deutsche Bank, with Deutsche Bank acting as a strawman and entering into "sham" contracts with the client.

71.    The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' conduct; the provision of professional advisory services to clients was merely an incidental byproduct of, not a motivating factor for, Defendants' conduct alleged herein. Further, the Defendants' and their co-conspirators arrangement gave each of the Defendants a significant

pecuniary interest in the advice and professional services they would render.

72.     The Defendants and their co-conspirators had a financial, business, and property interest in inducing Plaintiff, as well as other clients, to enter into the strategies at issue, and to do so, promised, opined and assured that the transactions would enable their clients to have a reasonable opportunity to make a profit and at the same time legally reduce their taxes.

73.     Plaintiff and the Class Members lost a significant amount of money in carrying out the strategies at issue.

74.     Plaintiff and the Class members also incurred and are continuing to incur significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against them.

75.     Defendants and their co-conspirators, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the sale of tax strategies, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon their clients. Further, Defendants made various false statements of material fact, and omitted to state material facts which made statements misleading, to their clients.

76.     The purpose and effect of Defendants' plan, transaction, and course of conduct was to generate huge fees by co-promoting alleged tax-savings strategies.

77.     Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  In this regard, Defendants' acts and omissions included, *inter alia*, failing to disclose to Plaintiff and the

Class Members that this strategy was designed, created, and implemented by Daugerdas, J&G,

Deutsche Bank, and Bank One, that the Deutsche Bank contracts were "sham" contracts, with no

real opportunity for Plaintiff or Class Members to make a profit, and that the tax strategies had

no business purpose or economic substance.

78.     As a result of and in reliance on these misrepresentations, omissions, and

promises, Plaintiff and the Class Members engaged in the tax strategies at issue.

79.     Had Plaintiff and the Class Members known of the material adverse information

which Defendants did not disclose, they would not have engaged in the tax strategies at issue.

80.     The Defendants owed duties to Plaintiff and the Class Members.  These duties

included the duty to:

           a.      Exercise prudence, caution and care in recommending financial
                    and tax advice; and

           b.      Exercise their responsibility to deal fairly and in good faith and
                    their fiduciary responsibilities of care and loyalty to Plaintiff and
                    the Class Members.

81.     Defendants breached their duties for personal gain.  Defendants intended to

deceive their clients, as evidenced by the aggressive push Defendants took, directly and through

marketing programs, to convince their clients to enter into the illegal tax shelters.  Defendants

intentionally deceived Plaintiff and the Class Members by advising them to enter into contracts

on the premise that they could make a profit, when Defendants knew or recklessly disregarded

the fact that the contracts would not be profitable.  Further, Defendants knew or recklessly

disregarded the fact that the tax strategies would be disallowed if detected by the IRS.  These

transactions were perpetrated through Defendants' discrete acts of misrepresentation.

## FIRST CLAIM FOR RELIEF

### Civil Violations of the Racketeer Influenced and Corrupt Organizations Act

82.    Plaintiff and the Class repeats and realleges each and every prior allegation as if full set forth herein.

83.    Plaintiff and the Class Members are "persons" within the meaning of 18 U.S.C. §1964(c).

84.    At all times relevant hereto, the Plaintiff, the Class Members, and the Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

85.    An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

86.    The enterprise at issue in this case, for purposes of 18 U.S.C. §§1961(3) and 1962(a), 1962(b), 1962(c) and 1962(d), is an association-in-fact of all Defendants and non-defendant co-conspirators referred to herein as "the Enterprise." Additional wrongdoers that may be part of the association-in-fact enterprise (sometimes referred to herein as "Member" or "Members") include the individual Defendants themselves, those employees and agents of the Defendants and other non-defendant entities or co-conspirators that participated in the fraudulent representations to the Plaintiff, the Class Members, the public, the courts, and various regulatory and enforcement agencies.

87.    While the Defendants participated in the Enterprise and were a part of it, the Defendants also have an existence separate and distinct from the Enterprise.

88.     Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

89.     Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

90.     The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

91.     Defendants and all other Members of the Enterprise worked together to orchestrate the pursuit of customer prospects; the promotion and the sale of illegal tax shelters; and shared fees, costs, information, resources, and the fruits of its predicate acts.  The association-in-fact enterprise, Defendants and other Members of the Enterprise, was a formal, ongoing relationship which functioned as a continuing unit, pursuing a course of conduct as set forth above (i.e., the pursuit of customer prospects, and the promotion and the sale of the illegal tax shelters), with a common or shared purpose (i.e., to convince potential clients to allow it to attempt to eliminate those clients' tax liabilities, all the while charging exorbitant fees) and continuity of structure and personnel.

92.     Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§1962(a) and (b), and have conspired to violate § 1962(c) in violation of §1962(d) by pursuing and soliciting clients, designing, creating, engineering, implementing, marketing, promoting and/or selling and inducing the purchase of transactions which were designed to reduce or eliminate tax liability and which have been, or

will be, determined by the IRS to be illegal and/or abusive tax shelters under Federal tax laws, IRS Notice 1999-59 or IRS Notice 2000-44.

93.    All Defendants have violated 18 U.S.C. §1962(d), inasmuch as they knowingly, intentionally, and unlawfully, aiding and abetting each other, conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

### Defendants' Scheme

94.    For a substantial period of time, the Defendants knowingly, intentionally and directly participated in, or aided and abetted, counseled, commanded, induced, procured or caused and conspired in the pursuit of and solicitation of and eventual inducement of Plaintiff and the Class to participate in tax strategies, which were designed to reduce or eliminate tax liability, by means of false or fraudulent representations or promises by the use of the mails and/or wires for purposes of the execution of their scheme. In furtherance of their scheme, Defendants failed to reveal to the Plaintiff and the Class the number of other participants that were pursued and solicited by the Enterprise for placement into, and that actually were induced to participate in, these same or similar tax strategies which the Enterprise knew, and was in the best position to know that the tax strategies would not withstand the challenge and/or scrutiny of the IRS. This was not a single scheme intended to induce one sole victim to do anything; the Members of the Enterprise schemed to pursue and solicit several hundred, if not more than a thousand, victims, as evidenced by 1) the multiple reported cases filed against various Members of the Enterprise with the same operative facts; 2) a July 1, 2004 IRS announcement of a turnout of more that 1,500 taxpayers electing to settle with the IRS for participating in the illegal or

abusive tax shelters; and 3) recent reports that J&G generated over $250 million in fees for its

role in implementing the tax strategies and issuing opinion letters validating the strategies, over

$50 million of which went to banking institutions like Bank One.

95.    Most of the Bank One's victims were existing clients.  For instance, Plaintiff, a

long time Bank One client, was targeted by a Bank One private banking financial advisor, Troy

D. Hebert, and was subsequently defrauded by the Enterprise.  Mr. Hebert advised Plaintiff to

meet with Bank One ISG representatives to discuss capital gain elimination strategies.

96.    On August 23, 2001, Plaintiff met with Defendant John B. Ohle, III, and others,

including Defendant Daigle.  The Defendants proposed that the Enterprise offered new and

unique products or strategies which could reduce or eliminate certain of the Plaintiff's 2001 tax

liabilities.  Ohle gave his background as a tax attorney and indicated that he was involved in

writing some tax code.

97.    The Defendants proposed that Plaintiff enter into a series of options contracts and

sophisticated transactions which may produce a profit or loss, but that any loss sustained would

be substantially outweighed by the tax savings generated by the transactions.

98.    Plaintiff's decision to engage the Enterprise was based on the advice,

representations and recommendations of Defendant Ohle, and other members of the Enterprise,

during the initial presentation and thereafter.

99.    As a result of the interaction with Ohle and the Enterprise, Plaintiff entered into a

series of transactions with Deutsche Bank and others which were orchestrated by the Enterprise

with limited foreknowledge or input from Plaintiff other than signatures giving authority to the

Enterprise to act in furtherance of its promises.  For example, on October 31, 2001, Paul

Daugerdas, on behalf of J&G, mailed to Plaintiff's local counsel a set of documents to be

executed by Plaintiff in connection with the tax strategies, which included a Deutsch Bank

account form, a document related to a trust created by American National Bank and Trust

Company of Chicago to implement the tax strategy, and a spousal consent form.

100.    The more clients that the Defendants pursued, solicited and eventually induced to

participate in the scheme, the more money it would earn.  Moreover, other Members and

co-conspirators of the Enterprise were paid out of the fees paid by Plaintiff to the Enterprise, in

many cases without the knowledge of Plaintiff, in furtherance of the Enterprise.  For example,

after Bank One was served with a summons from the IRS for information relating to Bank One's

tax shelter promotion activities with J&G, Plaintiff received from Bank One documents held by

J&G and Bank One which included a fee agreement between Bank One and J&G, whereby J&G

agreed to pay Bank One a substantial fee for its role in securing the Plaintiff's engagement of

J&G.  It has also been subsequently revealed that J&G paid Plaintiff's local counsel in Louisiana

a fee to ensure that Plaintiff engaged J&G, all without Plaintiff's knowledge or approval.

101.    Prior to and during all transactions relative hereto, the Enterprise represented to

Plaintiff that these tax strategies were new and unique and as such, not substantially similar to

transactions that had been deemed abusive by the IRS in official notices and announcements.  In

fact, the Enterprise knew or recklessly disregarded the fact that the tax strategies they were

marketing and promoting were substantially similar to prior strategies found abusive by the IRS,

and, as such, would be intensely scrutinized by the federal and state tax authorities and regarded

as illegal tax shelters.

102.    The fees paid by the Plaintiff enabled the Enterprise to pursue, solicit and induce

other individuals and entities to participate in the tax strategies at issue.  The fees were reinvested into the Enterprise in order to fund the Enterprise, using or investing, directly or indirectly, part of the income, or the proceeds of such income, gained from the pattern of racketeering activity alleged herein back into the Enterprise in order to be able to pursue additional clients and induce them to participate in the scheme set forth herein.  Defendants and their co-conspirators invested the money back into the Enterprise in order to provide the funding to market their tax strategies to other high net-worth individuals and/or business entities, which also caused injury to Plaintiff since the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold compromised the viability of all of the transactions globally.  It is the policy of the IRS to apply the federal tax laws fairly and uniformly to all taxpayers.  Thus, although the Defendants knew or recklessly disregarded the fact that the tax scheme they promoted would be deemed illegal and/or abusive, the sheer volume of transactions solicited by the Defendants and the resulting extraordinary loss in tax dollars to the government foreclosed any possibility that the tax authorities would find in favor of the Plaintiff.

      103.    While soliciting Plaintiff, but before J&G delivered an actual tax opinion, the Enterprise, through Defendant Ohle, expressly and repeatedly represented to Plaintiff that:

         i.      the tax strategy was highly defensible;

         ii.     if the tax strategy was challenged by the IRS, at worst, the IRS would settle at a substantial discount of the tax liability otherwise due; and

        iii.    due to the underlying defensibility of the strategy and the litigation risk to the IRS, the Plaintiff would not have to pay interest or penalties.

104.    On April 8, 2002, months after the Enterprise had pursued and solicited Plaintiff, and months after the Plaintiff had paid the exorbitant fees to the Defendants and other Members of the Enterprise, Plaintiff received a legal opinion from J&G, backdated to January 9, 2002, and other information necessary to complete tax returns with respect to the transactions at issue. The opinions Plaintiff received stated in pertinent part: "we are of the opinion that the described tax consequences have substantial authority and that it is more likely than not that you should prevail if challenged by the IRS."

105.    In June of 2004, Plaintiff was notified by the IRS that the transactions he had entered into were or would be determined to be potentially abusive.

106.    Plaintiff was denied the opportunity to make a well-reasoned business decision regarding the risks involved in engaging in the schemes concocted by the Enterprise due to various misrepresentations and failures to disclose made by the Enterprise. In particular, Bank One, through Defendants Ohle, and among others, made misrepresentations to Plaintiff, or representatives of the Plaintiff, about the defensibility and validity of the underlying tax strategies as set forth above.

107.    The Enterprise never fully disclosed the risks or clearly articulated the nature of the transactions to Plaintiff and, in fact, completely misrepresented the worst case scenario to the Plaintiff.

**Predicate Acts**

108.    With respect to the activities alleged herein, the Enterprise acted at all times with malice toward the Plaintiff and the Class Members, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and the Enterprise. Such conduct was

done with actionable wantonness and reckless disregard for the rights of Plaintiff and the Class

Members. These predicate acts were acts of deception which furthered the goal of soliciting

clients to participate in what the Enterprise knew or should have known was fraudulent and

would be deemed abusive by the IRS. Specifically, the Enterprise knew that certain of its

strategies had been deemed abusive by the IRS and that "new" strategies that they were

promoting were not different enough to survive inspection or investigation by the IRS.

Moreover, the Enterprise knew that it was placing several hundred, perhaps over a thousand,

individuals and/or business enterprises in these strategies, likely foreclosing any possibility that

the tax authorities would find in favor of their clients.

109.    With respect to the activities alleged herein, the Enterprise was seeking to aid and

abet and was aiding and abetting a transaction to violate 18 U.S.C. §§1962(a), (b) and (c). Each

Member of the Enterprise agreed to interfere with, obstruct, delay or affect interstate commerce

by attempting to obtain and/or actually obtaining fees to which the Enterprise was not entitled.

110.    With respect to the overt acts and activities alleged herein, each Member of the

Enterprise conspired with each other non-defendant entity or co-conspirator to violate 18 U.S.C.

§§1962(a), (b) and (c), all in violation of 18 U.S.C. § 1962(d). In violation of § 1962(c), each

Member of the Enterprise agreed and conspired with each other Member, including others not

named as defendants in this matter, to: 1) pursuant to § 1962(a), invest fees paid by Plaintiff and

the Class Members into pursuing and soliciting other clients, inducing and causing other

individuals and business entities to participate in the tax strategies at issue; and 2) pursuant to §

1962(b), acquire or maintain property interests to which the Enterprise was not entitled through

its racketeering activity by charging exorbitant fees for tax strategies it knew would be deemed

unacceptable by the IRS.

111.    The Enterprise and its individual Members exceeded any legitimate role of diligent tax or financial advisers by designing, creating, engineering, implementing, marketing, promoting and/or selling a series of these tax strategies in an attempt to conspire to obtain money in the form of fees and commissions, knowing that the underlying strategies were not defensible to the IRS.  Upon information and belief, the Enterprise participated in some of these transactions via partnerships that it formed to make the strategies perform.  Many of these tax strategies have been and/or likely will be deemed illegal and/or abusive pursuant to federal tax laws.

112.    The Enterprise's schemes have resulted in severe financial and business losses to Plaintiff and the Class.  Moreover, as a result of the Enterprise's wire fraud and mail fraud violations, Plaintiff and the Class have suffered extensive monetary damages consisting of unexpected tax liability, fees and commissions paid to the Enterprise, as well as interest and penalties which the IRS will likely seek.  Plaintiff has also suffered additional damages, including but not limited to opportunity costs, additional legal, tax advisor and accountant fees and reputation damage.

113.    The Enterprise's documents and communications associated with the schemes at issue contained false and/or misleading representations, including but not limited to assertions that:

    a.      No penalties would or could be assessed by the IRS or state taxing authorities because the transaction's unique characteristics and the opinion itself provided complete "penalty protection;"

b.    These strategies were new and unique and would not be subject to the same

scrutiny as other potentially illegal and abusive strategies that had been identified

by the IRS in its earlier Notices and/or Announcements;

c.    The tax legal opinion it provided was highly defensible;

d.    If the strategies were challenged by the IRS, at worst, the IRS would settle at a

substantial discount of the tax liability otherwise due;

e.    Due to the underlying defensibility of the opinion to the Plaintiff and the litigation

risk to the IRS, Plaintiff would not have to pay interest or penalties; and

f.    The private contracts entered into with Deutsche Bank could be very profitable.

114.    These misrepresentations constitute "false or fraudulent pretenses, representations

or promises" within the meaning of the mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C.

§1343) provisions.

115.    All of the Members of the Enterprise actively participated in this elaborate and

abusive scheme to obtain money from Plaintiff and the Class Members, even those not named as

defendants in this matter.

116.    In carrying out the overt acts and fraudulent transactions described herein, the

Defendants engaged in conduct in violation of various state and federal laws and regulations,

including but not limited to 18 U.S.C. §§1341, 1343, 1346 and 1961 et seq, and both state and

federal banking laws.

117.    18 U.S.C. 1961(1) provides that "racketeering activity means any act indictable

under any of the following provisions of Title 18, United States Code: §1341 (relating to mail

fraud), § 1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud).

**Violations of 18 U.S.C. Sections 1341 and 1343**

118.    For the purpose of executing and/or attempting to execute its transactions to defraud and to obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories for mail, matter and things to be sent or delivered by the Postal Service and/or deposited or caused to be deposited matter or things to be sent or delivered by a private or commercial interstate carrier, and received matter and things therefrom including but not limited to contracts, instructions, correspondence, opinion letters, and other items.

119.    Specifically, for example, (1) on October 31, 2001, Paul Daugerdas, on behalf of J&G, mailed to Plaintiff's local counsel a set of documents to be executed by Plaintiff in connection with the tax strategies, which included a Deutsch Bank account form, a document related to a trust created by American National Bank and Trust Company of Chicago to implement the tax strategy, and a spousal consent form; (2) American National Bank and Trust Company of Chicago mailed tax documents to Plaintiff which stated that he had suffered a substantial short term loss in his irrevocable trust and directed him to deduct this loss on his personal income tax return for the tax year ended December 31, 2001; and (3) on April 8, 2002, J&G mailed Plaintiff a letter with an approximately 100-page tax legal opinion, which J&G backdated to January 9, 2002, and which stated that, among other things, Plaintiff was more likely than not entitled to deduct his losses reported to him by American National Bank and Trust Company of Chicago.

120.    For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the

Enterprise, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things

therefrom, including but not limited to contracts, instructions, correspondence, opinion letters,

funds and other things.

121.    Specifically, for example, (1) On October 17, 2001, J&G faxed a confidentiality

agreement to Plaintiff's local counsel requiring that Plaintiff and his counsel agree to keep the tax

strategies at issue confidential; (2) On October 17, 2001, Defendant Conrad faxed to J&G an

information questionnaire, which included transaction information for Plaintiff, including the

amount of the transaction, the annual income and net worth of the Plaintiff, and the referring

bank; (3) On November 9, 2001 Defendant Deichmann faxed Plaintiff instructions to wire funds

to Deutsche Bank, which included Deutsche Bank account information; and (4) on December 12,

2001, Defendant Daigle, from ISG's Louisiana branch, sent an e-mail to ISG employees in

Illinois, who included Defendants Conrad, Ohle, and Deichmann, seeking advice from Defendant

Conrad on the total amount of fees to be divided among the various parties and confirming that

the portion to be paid to Bank One was $180,000.

122.    The Enterprise's use of the mails and wires includes private and public

components.

123.    The Enterprise utilized the U.S. Mail and wire to communicate among

themselves, as well as with its co-conspirators, Plaintiff and the Class Members.  For instance,

while Bank One and Plaintiff were located in Louisiana during the implementation of the scheme

at issue, the other individual defendants lived and worked in Illinois, and participated in this

scheme from there.  Other Members of the Enterprise were located elsewhere.  In order to carry

out and implement its scheme, the Enterprise necessarily had to communicate by the mails and

wires.

124.    In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, the Enterprise falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiff and the Class, in violation of 18 U.S.C. §§1341 and 1343, including but not limited to the following:

a.    Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.    Falsely claiming that the transactions and the to-be-received tax opinions would protect Plaintiff and the Class Members from any tax penalties;

c.    Misrepresenting the likelihood that Plaintiff and the Class Members would prevail should a dispute arise with taxing authorities;

d.    Failing to advise that the transaction had no business purpose and no economic substance;

e.    Failing to disclose that the IRS had previously issued official notices and announcements deeming substantially similar tax strategies to be abusive and/or illegal;

f.    Failing to disclose the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of Plaintiff and the Class;

g.    Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense,

and had no business purpose or economic substance;

h.      Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

i.      Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

j.      Informing the Plaintiff that the tax strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

k.      Advising, recommending, instructing, and assisting Plaintiff and the Class Members in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

125.    The Enterprise intentionally and knowingly made these misrepresentations and intentionally and knowingly suppressed material facts from the Plaintiff and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Enterprise either knew, should have known, or recklessly disregarded that the misrepresentations and omissions described herein were material. Plaintiff and the Class justifiably relied on the misrepresentations and omissions in carrying out the transactions and in subsequently filing their tax returns.

126.    Plaintiff and the Class has therefore been injured in its business or property by the Enterprise's overt acts and racketeering activities.

### Pattern of Racketeering Activity

127.    The violations set forth herein constitute "racketeering activities" or "predicate

acts" within the meaning of 18 U.S.C. § 1961(1), and include but are not limited to:

a.   Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.   Falsely claiming that the transactions and the to-be-received tax opinions would protect Plaintiff and the Class Members from any tax penalties;

c.   Misrepresenting the likelihood that Plaintiff and the Class Members would prevail should a dispute arise with taxing authorities;

d.   Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

e.   Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

f.   Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

g.   Informing the Plaintiff that the tax strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

h.   Advising, recommending, instructing, and assisting Plaintiff and the Class Members in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

i.   Failing to advise that the transaction had no business purpose and no economic substance;

j.    Misrepresenting the volume of transactions pursued, solicited and originated by The Enterprise, specifically leading Plaintiff to believe it was the one of a select few clients with whom the Defendants were working to attempt to eliminate tax liability in this manner;

k.    Taking advantage of a relationship of trust and confidence and using its knowledge of their clients' finances to pursue and solicit and eventually induce Plaintiff and the Class to participate in tax strategies concocted by the Enterprise;

l.    Charging and collecting unreasonable, excessive, and unethical fees;

m.    Failing to reveal to the Plaintiff the number of other participants in the scheme, which Plaintiff has since discovered numbered in the hundreds and in fact probably exceeded a thousand;

n.    Illegally promoting an unregistered tax shelter by marketing it to Plaintiff and the Class;

o.    Failing to disclose to Plaintiff and the Class Members that if they filed tax returns claiming capital and/or ordinary losses based on the tax strategies concocted by the Enterprise, they would be liable to taxing authorities including the IRS for penalties and interest;

p.    Advising Plaintiff that the capital and/or ordinary losses created by the tax strategies concocted by the Enterprise were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

q.    Representing and advising Plaintiff that the various entities formed to carry out the tax strategies concocted by the Enterprise had a business purpose as well as

economic substance;

r.     Directing and assisting Plaintiff in making cash contributions to various entities

       formed for the purpose of carrying out the tax strategies concocted by the

       Enterprise;

s.     Defendants' directing, instructing, and assisting Plaintiff and the Class Members

       in carrying out each of the steps of the scheme concocted by defendants and other

       Members of the Enterprise, including directing Plaintiff and the Class Members to

       sign authorizations and agreements with third parties other than Defendants;

t.     Failing to advise, recommend, and instruct Plaintiff and the Class Members to

       amend their tax returns, timely or otherwise;

u.     Advising Plaintiff that the tax strategies concocted by the Enterprise were valid

       and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

v.     Providing erroneous legal, banking, financing, and tax opinions and advice;

w.     Enticing, recommending, advising, assisting and directing Plaintiff and the Class

       Members to enter into a transaction that, unbeknownst to the Plaintiff and the

       Class Members, would be deemed abusive and improper and would be disallowed

       and held invalid by the IRS on the grounds that the transaction lacked economic

       substance, had no business purpose, was a "sham transaction," and violated the

       step transaction, sham transaction, and economic substance doctrines, despite the

       representations to the contrary in the tax legal opinions provided by the

       Enterprise; and

x.     Failing to notify Plaintiff and the Class Members that the Enterprise and its

co-conspirator Members schemed to pursue, solicit, induce, and then place several

hundred, perhaps over a thousand, customers into these tax strategies with full

knowledge that they would not pass IRS muster.

128.    The Enterprise has engaged in a "pattern of racketeering activity," as defined in §

1961of RICO, by committing and/or conspiring to commit or aiding and abetting a transaction

with at least two such acts of racketeering activity, as described specifically herein, within the

past ten years.  In fact, upon information and belief, each of the Members of the Enterprise and

its co-conspirators have committed at minimum several hundred of acts of racketeering activity.

Each act of racketeering activity was related, had similar purposes, involved the same or similar

participants and methods of commission, and had similar results impacting similar victims,

including Plaintiff and the Class herein.

129.    The Enterprise's innumerable racketeering activities or predicate acts are related

and also amount to a continuous criminal activity.

130.    These predicate acts are related in the sense that they have the same purpose (to

carry out the scheme described herein); result (to obtain money); victims (such as Plaintiff and

the Class herein and several hundred, if not thousands, of others); method of commission (the

scheme described herein); and are otherwise interrelated by distinguishing characteristics and are

not isolated events, because they were carried out for the same purpose.

131.    The predicate acts were committed in the same manner, and they constituted the

Enterprise's "normal" way of doing business with regard to pursuing and soliciting clients,

inducing them to participate and then giving tax strategy advice.  Defendants are also engaged in

banking activities separate and apart from the scheme described herein, and their unlawful

actions which constitute the predicate acts giving rise to this RICO claim (set forth herein) are within their "normal" and "regular" way of doing business.

132.    The Enterprise's course of action entails a span of years, during which Defendants committed numerous, related predicate acts, as set forth specifically herein, as part of its continuing scheme. Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning and structure of the operations described herein in the persecution of Plaintiff and the Class and the Enterprise's several hundred, perhaps over a thousand, other victims.

133.    The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment and Unjust Enrichment

134.    An actual, justiciable controversy exists between Plaintiff and the Class Members on the one hand and the Defendants and other Members of the Enterprise on the other.

135.    Had the Plaintiff and the Class Members not been pursued, solicited and enticed to enter into the tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise, they would not have paid fees to the Defendants and other Members of the Enterprise. Plaintiff seeks a declaration that, due to the foregoing lack of consideration, the Enterprise has been unjustly enriched and all fees paid to the Enterprise, including but not limited to fees paid to non-defendant co-conspirator Members, should be

returned to Plaintiff and the Class Members.

## THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty

136.   The Enterprise was Plaintiff and the Class Members' fiduciary, and thus owed to

Plaintiff and the Class Members the duties of honesty, loyalty, care and compliance.

137.   The Enterprise breached its fiduciary duty to Plaintiff and the Class Members by

advising them to engage in the tax strategies designed, created, engineered, implemented,

marketed, promoted and/or sold by the Enterprise in reliance on its advice, representations,

recommendations, instructions, and opinions, which the Enterprise knew or should have known

to be improper and illegal, based on the members of the Enterprise's prior experience with

similar strategies which they had also promoted and which had been deemed abusive by the IRS,

for the purpose of generating huge fees for the Enterprise.

138.   The Enterprise breached its fiduciary duties to Plaintiff and the Class Members

by, among others, the following acts and/or omissions:

  a.    Misrepresenting the proposed transactions as unique and/or distinct from those

         previously designed by Members of the Enterprise itself and by other promoters;

  b.    Falsely claiming that the transactions and the to-be-received tax opinions would

         protect Plaintiff and the Class Members from any tax penalties;

  c.    Misrepresenting the likelihood that Plaintiff and the Class Members would prevail

         should a dispute arise with taxing authorities;

  d.    Failing to notify Plaintiff and the Class Members that the Enterprise and its

         co-conspirator Members schemed to pursue, solicit, induce, and then place several

hundred, if not more than a thousand, customers into these tax strategies with full knowledge that they would not pass IRS muster;

e.    Misrepresenting the volume of transactions in which J&G, the Member of the Enterprise that actually provided the tax legal opinion, produced opinions;

f.    Failing to disclose the true likelihood that the IRS would not accept the tax treatment of these transactions as indicated in the opinion letters, based on the transactions' similarity to other transactions that had been deemed abusive and which had also been designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise;

g.    Failing to disclose the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiff or the Class;

h.    Failing to ensure that the transactions into which the Enterprise advised Plaintiff and the Class Members to enter complied with applicable State and Federal Rules and Regulations;

i.    Taking advantage of a relationship of trust and confidence and using its knowledge of the Defendants' clients' finances to pursue and solicit and eventually induce Plaintiff and the Class Members to participate in tax strategies concocted by the Enterprise;

j.    Advising and recommending that Plaintiff engage in tax strategies concocted by the Enterprise;

k.    Charging and collecting unreasonable, excessive, and unethical fees;

l.    Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

m.    Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

n.    Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

o.    Informing the Plaintiff that the tax strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

p.    Advising, recommending, instructing, and assisting Plaintiff and the Class Members in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

q.    Failing to advise that the transaction had no business purpose and no economic substance;

r.    Failing to reveal to the Plaintiff the number of other participants in the scheme, which Plaintiff has since discovered numbered in the hundreds and in fact probably exceeded a thousand;

s.    Illegally promoting an unregistered tax shelter by marketing it to Plaintiff and the Class;

t.    Failing to disclose to Plaintiff and the Class Members that if they filed tax returns

claiming capital and/or ordinary losses based on the tax strategies concocted by

the Enterprise, they would be liable to taxing authorities including the IRS for

penalties and interest;

u.      Advising Plaintiff that the capital and/or ordinary losses created by the tax

strategies concocted by the Enterprise were legitimate, proper, and in accordance

with all applicable tax laws, rules and regulations;

v.      Representing and advising Plaintiff that the various entities formed to carry out

the tax strategies concocted by the Enterprise had a business purpose as well as

economic substance;

w.      Directing and assisting Plaintiff and the Class Members in making cash

contributions to various entities formed for the purpose of carrying out the tax

strategies concocted by the Enterprise;

x.      Directing, instructing, and assisting Plaintiff and the Class Members in carrying

out each of the steps of tax strategies concocted by the Enterprise, including

asking Plaintiff and the Class Members to sign authorizations and agreements;

y.      Failing to advise, recommend, and instruct Plaintiff and the Class Members to

amend his and their tax returns, timely or otherwise;

z.      Advising Plaintiff that IRS Notice 1999-59 and IRS Notice 2000-44 did not apply

to the tax strategies concocted by the Enterprise and/or that it did not impact such

strategies, knowing all the while that other similar strategies that they had also

promoted had already been deemed abusive;

aa.     Failing to advise, recommend and/or instruct Plaintiff and the Class Members to

amend their tax returns in light of IRS Notices or Announcements or otherwise;

bb.     Advising Plaintiff that the tax strategies concocted by the Enterprise were valid

and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

cc.     Providing erroneous legal, banking, financing, and tax opinions and advice; and

dd.     Enticing, recommending, advising, assisting and directing Plaintiff and the Class

Members to enter into a transaction that, unbeknownst to the Plaintiff and the

Class Members, would be deemed abusive and improper and would be disallowed

and held invalid by the IRS on the grounds that the transaction lacked economic

substance, had no business purpose, was a "sham transaction," and violated the

step transaction, sham transaction, and economic substance doctrines, despite the

representations to the contrary in the tax legal opinions provided by the

Enterprise.

139.     As a result of the Enterprise's conduct set forth herein, Plaintiff and the Class

Members have suffered injury in that they, among other things: 1) paid to the Defendants and

other Members of the Enterprise exorbitant fees; 2) took undue financial risk; 3) likely will incur

tax penalties and interest; 4) have incurred opportunity costs; 5) have and will continue to incur

substantial additional costs in hiring new tax and legal advisors to rectify the situation; 6) have

incurred reputation damage; and 7) have foregone alternative tax opportunities.

## FOURTH CLAIM FOR RELIEF

### Fraud
### (On Behalf of Plaintiff Only Against All Defendants)

140.     The Enterprise made misrepresentations to the Plaintiff herein for the purpose of

inducing him to participate in its schemes and to pay the Enterprise enormous sums of money.

141.   In order to induce the Plaintiff to pay it exorbitant fees, the Defendants and other Members of the Enterprise made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiff, including but not limited to:

a.   Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.   Falsely claiming that the transactions and the to-be-received tax opinions would protect the Plaintiff from any tax penalties;

c.   Misrepresenting the likelihood that the Plaintiff would prevail should a dispute arise with taxing authorities;

d.   Misrepresenting the volume of transactions pursued, solicited and originated by The Enterprise, specifically leading Plaintiff to believe it was the only client with whom the defendants were working to attempt to eliminate tax liability in this manner;

e.   Misrepresenting the volume of transactions in which J&G, the Member of the Enterprise that actually provided the tax legal opinion, produced opinions;

f.   Failing to disclose the true likelihood that the IRS would not accept the tax treatment of these transactions as indicated in the opinion letters, based on the transactions' similarity to other transactions that had been deemed abusive and which had also been designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise;

g.   Failing to disclose the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted

and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiff;

h.    Taking advantage of a relationship of trust and confidence and using its knowledge of the Defendants' clients' finances to pursue and solicit and eventually induce Plaintiff to participate in tax strategies concocted by the Enterprise;

i.    Charging and collecting unreasonable, excessive, and unethical fees;

j.    Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

k.    Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

l.    Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

m.    Informing the Plaintiff that the tax strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

n.    Advising, recommending, instructing, and assisting Plaintiff in engaging into a transaction which he was advised had business purpose and economic substance and made investment sense;

o.    Failing to advise that the transactions had no business purpose and no economic substance;

p.    Failing to reveal to the Plaintiff the number of other participants in the scheme, which Plaintiff has since discovered numbered in the hundreds, and in fact probably exceeded a thousand;

q.    Illegally promoting an unregistered tax shelter by marketing it to Plaintiff;

r.    Failing to disclose to Plaintiff that if he filed tax returns claiming capital and/or ordinary losses based on the tax strategies concocted by the Enterprise, he would be liable to taxing authorities including the IRS for penalties and interest;

s.    Advising Plaintiff that the capital and/or ordinary losses created by the tax strategies concocted by the Enterprise were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

t.    Representing and advising Plaintiff that the various entities formed to carry out the tax strategies concocted by the Enterprise had a business purpose as well as economic substance;

u.    Directing and assisting Plaintiff in making cash contributions to various entities formed for the purpose of carrying out the tax strategies concocted by the Enterprise;

v.    Directing, instructing, and assisting Plaintiff in carrying out each of the steps of tax strategies concocted by the Enterprise, including asking Plaintiff to sign authorizations and agreements;

w.    Failing to advise, recommend, and instruct Plaintiff and the Class Members to amend his and their tax returns, timely or otherwise;

x.    Advising Plaintiff that IRS Notice 2000-44 did not apply to the tax strategies

concocted by the Enterprise and/or that it did not impact such strategies, knowing all the while that other similar strategies that they had also promoted had already been deemed abusive;

y.     Advising Plaintiff that the tax strategies concocted by the Enterprise were valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

z.     Failing to ensure that the transactions into which the Enterprise advised Plaintiff to enter complied with applicable State and Federal Rules and Regulations;

aa.    Providing erroneous legal, banking, financing, and tax opinions and advice; and enticing, recommending, advising, assisting and directing Plaintiff to enter into a transaction that, unbeknownst to Plaintiff, would be deemed abusive and improper and would be disallowed and held invalid by the IRS on the grounds that the transaction lacked economic substance, had no business purpose, was a "sham transaction," and violated the step transaction, sham transaction, and economic substance doctrines, despite the representations to the contrary in the tax legal opinions provided by the Enterprise; and

bb.    Failing to notify Plaintiff that the Enterprise and its co-conspirator Members schemed to pursue, solicit, induce, and then place several hundred, if not more than a thousand, customers into these tax strategies with full knowledge that they would not pass IRS muster.

142.    The above intentional omissions of material fact and/or affirmative representations made by each Defendants and other Members of the Enterprise and its co-conspirators were false or were likely to be false when made and the Enterprise knew or

recklessly disregarded the fact that these representations were false when made with the intention that Plaintiff rely on them in deciding whether or not to take the advice of the Defendants and other Members of the Enterprise and thereby pay it exorbitant fees and commissions.  In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by Defendants and other Members of the Enterprise with the intent to induce Plaintiff to enter into the abusive tax strategies and pay it exorbitant fees.

143.    In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regard the transactions at issue, Plaintiff paid to the Defendants and other Members of the Enterprise exorbitant fees to execute the transactions, did not avail himself of alternative tax opportunities, filed federal and state tax returns that have been and/or likely will be deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend his tax returns.

144.    But for the Enterprise's intentional misrepresentations and material omissions described herein, Plaintiff would never have engaged the Enterprise for advice on his tax strategies, engaged in the transactions at issue, claimed the purportedly resulting capital and/or ordinary losses on their income tax returns, filed and signed his tax returns in reliance on the advice of the Enterprise, failed to amend his tax returns, and/or failed to avail himself of other alternative tax opportunities.

145.    After discovering the Enterprise's fraud, Plaintiff incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.  As a result of the Enterprise's conduct set forth herein, Plaintiff suffered injury in that he, among other things: 1) paid to the Defendants and other Members of the Enterprise exorbitant fees, 2)

took undue financial risk, 3) likely will incur tax penalties and interest, 4) has incurred opportunity costs; 5) has and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, 6) has incurred reputation damage, and 7) has foregone alternative tax opportunities.

146.    As a proximate result of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**Negligent Misrepresentation**

147.    The Enterprise owed Plaintiff and the Class Members duties of care, loyalty and honesty, and a duty to comply with the applicable standards of care.

148.    During the course of its dealings with Plaintiff and the Class Members, the Enterprise made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of fact, and gave numerous recommendations, advice, instructions, and opinions to Plaintiff and the Class Members, including but not limited to:

a.    Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.    Falsely claiming that the transactions and the to-be-received tax opinions would protect Plaintiff and the Class Members from any tax penalties;

c.    Misrepresenting the likelihood that the Plaintiff and the Class Members would prevail should a dispute arise with taxing authorities;

d.    Providing erroneous legal, banking, financing, and tax opinions and advice;

e.    Misrepresenting the volume of transactions in which J&G, the Member of the Enterprise that actually provided the tax legal opinion, produced opinions;

f.    Failing to disclose the true likelihood that the IRS would not accept the tax treatment of these transactions as indicated in the opinion letters, based on the transactions' similarity to other transactions that had been deemed abusive and which had also been designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise;

g.    Failing to disclose the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of Plaintiff or the Class;

h.    Failing to ensure that the transactions into which the Enterprise advised Plaintiff and the Class Members to enter complied with applicable State and Federal Rules and Regulations;

i.    Taking advantage of a relationship of trust and confidence and using its knowledge of the Defendants' clients' finances to pursue and solicit and eventually induce Plaintiff and the Class Members to participate in tax strategies concocted by the Enterprise;

j.    Advising and recommending that Plaintiff and the Class Members engage in tax strategies concocted by the Enterprise;

k.    Charging and collecting unreasonable, excessive, and unethical fees;

l.    Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

m.    Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

n.    Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

o.    Informing the Plaintiff that the tax strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

p.    Advising, recommending, instructing, and assisting Plaintiff in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

q.    Failing to advise that the transaction had no business purpose and no economic substance;

r.    Failing to reveal to the Plaintiff the number of other participants in the scheme, which Plaintiff has since discovered numbered in the hundreds and in fact probably exceeded a thousand;

s.    Failing to disclose to Plaintiff and the Class Members that if they filed tax returns claiming capital and/or ordinary losses based on the tax strategies concocted by the Enterprise, they would be liable to taxing authorities including the IRS for penalties and interest;

t.  Advising Plaintiff that the capital and/or ordinary losses created by the tax strategies concocted by the Enterprise were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

u.  Representing and advising Plaintiff that the various entities formed to carry out the tax strategies concocted by the Enterprise had a business purpose as well as economic substance;

v.  Directing, instructing, and assisting Plaintiff and the Class Members in carrying out each of the steps of tax strategies concocted by the Enterprise, including asking Plaintiff and the Class Members to sign authorizations and agreements;

y.  Failing to advise, recommend, and instruct Plaintiff and the Class Members to amend his and their tax returns, timely or otherwise;

x.  Advising Plaintiff that IRS Notice 1999-59 and IRS Notice 2000-44 did not apply to the tax strategies concocted by the Enterprise and/or that it did not impact such strategies, knowing all the while that other similar strategies that they had also promoted had already been deemed abusive;

y.  Advising Plaintiff that the tax strategies concocted by the Enterprise were valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

z.  Enticing, recommending, advising, assisting and directing Plaintiff and the Class Members to enter into a transaction that, unbeknownst to the Plaintiff and the Class Members, would be deemed abusive and improper and would be disallowed and held invalid by the IRS on the grounds that the transaction lacked economic substance, had no business purpose, was a "sham transaction," and violated the

step transaction, sham transaction, and economic substance doctrines, despite the

representations to the contrary in the tax legal opinions provided by the

Enterprise; and

aa.    Failing to notify Plaintiff and the Class Members that the Enterprise and its

co-conspirator Members schemed to pursue, solicit, induce, and then place several

hundred, if not more than a thousand, customers into these tax strategies with full

knowledge that they would not pass IRS muster.

149.    The Enterprise either knew or reasonably should have known its representations,

recommendations, advice, instructions, and opinions to be false, based on its Members' prior

experience with similar strategies which they had also promoted and which had been deemed

abusive by the IRS.  In addition, the rendering of such representations, recommendations, advice,

instructions and opinions, as well as the failure to advise Plaintiff and the Class Members of the

omissions as set forth herein, was negligent, grossly negligent, and reckless.

150.    In reasonable reliance on the Enterprise's false affirmative representations and

intentional omissions of material facts regarding the transactions at issue, Plaintiff and the Class

paid exorbitant fees to execute the transaction, did not avail themselves of alternative tax

opportunities, filed federal and state tax returns that have been and/or likely will be deemed to

reflect improper deductions for capital and ordinary losses resulting from the transactions, and

did not amend their tax returns.

151.    But for the Enterprise's failure to meet the applicable standard of care and the

intentional and/or negligent misrepresentations and material omissions described herein, Plaintiff

or the Class Members would never have engaged the Enterprise for advice on the tax strategies

concocted by the Enterprise, never would have engaged in those tax strategies, filed Federal and State tax returns that reflected deductions for capital and/or ordinary losses resulting from the tax strategies, failed to file amended returns for 2001 and/or failed to avail themselves of other alternative tax opportunities.

152.    After discovering the Enterprise's wrongdoing, Plaintiff and the Class incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

153.    As a result of the Enterprise's conduct set forth herein, Plaintiff and the Class has suffered injury in that they, among other things: 1) paid to the Defendants and other Members of the Enterprise exorbitant fees, 2) took undue financial risk, 3) likely will incur tax penalties and interest, 4) has incurred opportunity costs; 5) has and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, 6) has incurred reputation damage, and 7) has foregone alternative tax opportunities.

## DAMAGES

154.    As a proximate cause of the Enterprise's violation of 18 U.S.C. §§1962(a) - (d), Plaintiff and the Class have been injured in their business or property for the reasons described herein and because they were forced to expend a substantial amount of money in fees to the Enterprise for the false and fraudulent advice, and has paid and continues to incur substantial additional costs and expenses for engaging attorneys, tax attorneys, accountants and experts in an attempt to rectify the wrongs perpetrated against them.

155.    The Enterprise has exposed Plaintiff and the Class to substantial additional tax liability, including interest and penalties, due to the filing of tax returns based on the Enterprise's

illegal and/or abusive tax advice and its failure to advise Plaintiff and the Class to amend those returns.

156.    The Enterprise and its co-conspirators have caused Plaintiff and the Class to incur severe financial and business losses.

157.    As set forth herein, as a result of the conduct of the Enterprise and its co-conspirators, Plaintiff and the Class has suffered injury to their business and property in that they have paid to the Defendants and other Members of the Enterprise exorbitant fees and has incurred actual damages and losses in an amount to be proven at trial; likely will incur tax penalties and interest and disallowance of other certain deductions; has incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; and has foregone alternative tax and investment opportunities.

158.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to threefold the amount of actual damages suffered by them due to the actions of the Enterprise.

159.    Plaintiff and the Class are also entitled to be awarded the costs incurred in this suit, pre judgment interest, reasonable attorneys' fees and all other damages authorized by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, prays for relief as follows:

a.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

b.    As to the RICO claim, a judgment in favor of Plaintiff and the Class Members against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus treble damages, attorneys' fees, interest and costs;

c.     As to the Declaratory Judgment and Unjust Enrichment claim, an order on behalf of Plaintiff and the Class Members entering the declaratory relief prayed for herein, together with the return to the Plaintiff and the Class Members all amounts by which Defendants have been unjustly enriched;

d.     As to the Breach of Fiduciary Duty claim, a judgment in favor of the Plaintiff and the Class Members against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus attorneys' fees, interest and costs;

e.     As to the Fraud claim, a judgment in favor of the Plaintiff against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs, and return of all monies paid by Plaintiff and the Class Members herein, plus punitive damages in an amount of not less than $100,000,000;

f.     As to the Negligent Misrepresentation claim, a judgment in favor of the Plaintiff and the Class Members against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

g.     Awarding the Plaintiff and the Class Members disgorgement and/or other remedial relief;

h.     Allowing a trial by jury to the extent permitted by law;

i.     Awarding the Plaintiff and the Class Members pre-judgment and post judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

j.     Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York
      June 9, 2005

                                Respectfully submitted,

                                WOLF POPPER LLP

                                By: _____
                                  Lester L. Levy (9956)
                                  Emily Madoff (8407)
                                  James Kelly-Kowlowitz (9616)
                                  845 Third Avenue
                                  New York, New York 10022
                                  Tel. (212) 759-4600

                                *Attorneys for Plaintiff*