# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CLAUDE M. PENN JR.,

        Plaintiff,

        v.

JP MORGAN CHASE & CO., JPMORGAN
INVESTMENT ADVISORS INC., JPMORGAN CHASE
BANK, NA, JEFFREY T. CONRAD, JOHN B. OHLE,
III, SCOTT D. DEICHMANN, and BARBARA DAIGLE,

        Defendants.

No. 05-cv-5481(WHP)

**JURY TRIAL DEMANDED**



## SECOND AMENDED COMPLAINT

Plaintiff, by his attorneys, alleges the following based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The information and belief is predicated upon, among other things, IRS notices and announcements disallowing certain tax shelters, documents obtained from JP Morgan Chase & Co., and Jenkens & Gilchrist, P.C., relating to certain tax shelters that defendants advised Plaintiff and other of their clients to enter into, other cases filed and media reports related to the same or similar tax shelters at issue.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this suit as a civil enforcement action under 18 U.S.C. §§1961-1968, §901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in

particular, under 18 U.S.C. §1964 and other causes of action as set forth hereafter.

2.      As described in more detail below, the Defendants entered into various arrangements to market and promote certain tax strategies to high net-worth individuals and business entities in order to generate millions of dollars in fees. The Defendants arranged to solicit high net-worth clients, like Plaintiff, and induced them to engage in the illegal tax shelters and pay the Defendants lucrative fees by misrepresentations and advice that the Defendants knew were improper and illegal.

3.      Defendants represented the tax strategies as being new and unique and, as such, not substantially similar to transactions that had been deemed abusive by the Internal Revenue Service ("IRS"). To the contrary, the Defendants knew that the tax strategies they were advising Plaintiff to enter into were similar to prior strategies found abusive by the IRS and that, as a result, it would be, if detected, intensely scrutinized and ultimately ignored and disallowed by the tax authorities.

4.      Among other things, the Defendants represented that the tax strategies had been vetted by major law firms and were lawful, that these same law firms would provide legal opinions that attested to that characterization, and assured Plaintiff that the legal opinions provided protection against penalties that the tax authorities could assess in the unlikely event that they challenged the tax strategies' legitimacy. This advice has proven disastrous for Plaintiff in that he paid a significant amount of fees only to receive erroneous and incompetent advice that has caused him to be threatened with the assessment of substantial additional taxes, plus interest and penalties and has caused him to pay substantial amounts to rectify the misconduct of the Defendants.

5.    Plaintiff seeks disgorgement of all excessive and illegal fees he paid, plus compensation for all other damages sustained, including without limitation all fees and costs Plaintiff will incur responding to the federal and state tax agencies as a result of the Defendants' actions, and any additional amounts, such as taxes, interest, and penalties, that may be assessed by the federal and state tax agencies, all of which damages must be trebled under RICO.

## II.    JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1964(a) and 1964(c), and 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.    Venue lies in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the principal executive offices of JP Morgan Chase & Co. are located in New York, New York.  In addition, this Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965 because one or more Defendants reside, may be found, has an agent, or transacts its affairs in this District and all of the Defendants transacted business, or caused Plaintiff to transact business, in this District, with Deutsche Bank AG, to implement the tax shelters at issue.

## III.    THE PARTIES

### Plaintiff

8.    Plaintiff Claude M. Penn Jr. is a resident of Denham, Louisiana and was induced to enter into illegal tax shelters by Defendants.  Plaintiff suffered damages as a result of the wrongs complained of herein.

### Defendants

9.    Defendant J.P. Morgan Chase & Co. ("JPMorgan") is a financial holding

company incorporated under Delaware law in 1968. JPMorgan Chase is one of the largest banking institutions in the United States, with more than $1 trillion in assets and operations in more than 50 countries. On July 1, 2004, Bank One Corporation merged with and into JPMorgan. Plaintiff brings this action against JP Morgan Chase & Co., as the successor to Bank One Corporation (d/b/a Bank One).

10.     Defendant JPMorgan Investment Advisors Inc. is a wholly owned subsidiary of JPMorgan and became the successor to Bank One Investment Advisors Corporation ("BOIA"), a wholly owned subsidiary of Bank One Corporation, after Bank One Corporations's merger with JPMorgan.

11.     Defendant JPMorgan Chase Bank, NA is a wholly owned subsidiary of JPMorgan and the successor to Bank One, NA and American National Bank and Trust Company, wholly owned subsidiaries of Bank One Corporation.

12.     Hereinafter, the Defendants identified in paragraphs 9-11 will sometimes be referred to as "Bank One."

13.     Defendant Jeffrey T. Conrad ("Conrad") is an attorney and certified public accountant and was at all relevant times hereto a member of Bank One's Innovative Strategies Group ("ISG") located in Chicago, Illinois. ISG provided tax and estate planning services through Bank One Corporations's wholly owned subsidiary, BOIA. At all relevant times hereto, ISG operated through branch departments located throughout the United States.

14.     Defendant John B. Ohle, III ("Ohle") is a tax attorney and was at all relevant times hereto Regional Director of ISG located in Chicago, Illinois. Ohle attended marketing meetings and advised Bank One clients, including Plaintiff, to enter into illegal tax shelters.

15.     Defendant Scott D. Deichmann ("Deichmann") was at all relevant times hereto a member of ISG located in Chicago, Illinois. Deichmann attended marketing meetings and advised Bank One clients, including Plaintiff, to enter into illegal tax shelters.

16.     Defendant Barbara Daigle ("Daigle") was at all relevant times hereto Director of ISG for the Louisiana and Florida markets. Daigle, who joined Bank One in 1997 as a trust consultant, was a tax senior manager for KPMG, a nationally recognized accounting firm. Daigle attended marketing meetings and advised Bank One clients, including Plaintiff, to enter into illegal tax shelters.

## V. THE SCHEME TO DEFRAUD UNSUSPECTING CLIENTS

### A. Defendants and Their Co-Conspirators

17.     Bank One Corporation, at all relevant times acted through and together with its wholly owned subsidiaries, BOIA, Bank One, NA and American National Bank and Trust Company.

18.     BOIA is a nationally recognized investment manager with extensive experience managing money for a broad range of clients, from institutional investors, to middle market business owners, to affluent individuals.

19.     ISG, a division of BOIA, is a group of tax professionals who provide tax and estate planning services to BOIA clients.

20.     Defendants Conrad, Ohle, Deichmann, and Daigle were all members of ISG and advised their clients, including Plaintiff, to enter into the illegal tax shelters.

21.     Bank One, NA is Bank One's banking subsidiary. Bank One Corporation, acting together with and through, Bank One, NA, used its employees to identify wealthy clients and

refer these clients to ISG for improper tax planning advice.

22.     American National Bank and Trust Company is a wholly owned subsidiary of Bank One Corporation. Bank One Corporation used this subsidiary to create trusts to be used in certain of the illegal tax strategies sold to its clients.

23.     Jenkens & Gilchrist, a Professional Corporation ("J&G"), is a large nationally recognized law firm. The firm concentrates its practice in many areas of law, including Corporate & Securities, Estate Planning, and Tax.

24.     Paul M. Daugerdas ("Daugerdas") is an attorney and certified public accountant and at all relevant times hereto was a shareholder of J&G and headed J&G's structured investment practice and tax and estate planning practice.

25.     Deutsche Bank AG ("Deutsche Bank") is a company principally dedicated to financing foreign trade and offers various investment, financial, and related products and services to consumer and corporate clients worldwide.

26.     Hereinafter, J&G, Daugerdas, and Deutsche Bank will sometimes be referred to as "Co-Conspirators."

### B. The Illegal Tax Shelters

27.     All of the tax shelters were identical with slight variations regarding the types of entities, S-Corporations, Trusts, Partnerships, etc., used to accomplish the transactions. Defendants and its Co-Conspirators used variations to avoid detection by the IRS. Also, when the IRS issued official notices disallowing particular tax strategies, Defendants and its Co-Conspirators would change the tax strategies being sold so that if the schemes were detected by the IRS, they could argue that prior IRS notices did not apply to the "new" tax strategies because,

for example, the strategies involve trusts instead of partnerships.

28.     First, Defendants and their Co-Conspirators arranged for Deutsche Bank to draft a set of private options contracts, with Deutsche Bank acting as the counter party to the contracts. One method Defendants used to entice skeptical clients to enter into a tax strategy was to claim that the private contracts between the client and Deutsche Bank may in fact turn out to be very profitable or may produce an out-of-pocket loss, but that any out-of-pocket loss would be greatly outweighed by the resulting tax benefits from the tax strategy.  Because of the complexity of the contracts, the clients would not know that the contracts that they were entering into and paying for would not result in any profit.

29.     After the private contracts were arranged, and the client signed the contracts, the Defendants or J&G would create an entity for the client (possibly a partnership, a S-Corporation, or a trust) and cause the client to transfer the private contracts to the entity.  Next, the Defendants or J&G would cause the entity to engage in a pre-determined set of non-arms-length transactions with other entities established by Bank One and its Co-Conspirators.

30.     The Defendants and their Co-Conspirators would intentionally create layers of transactions to keep the tax shelter complex and difficult for the IRS, if not impossible, to detect. For instance, a *Chicago Lawyer* article, published in its May 2004 edition, stated that a U.S. assistant attorney investigating J&G's questionable tax shelters on behalf of the IRS had to request an order from the court that J&G produce a list of all the clients that used the tax shelter because "the clients are nearly impossible to find without Jenkens' cooperation."

31.     The end result of a particular tax strategy is that the client is left with a substantial "paper" loss.

32.     The Defendants advised their clients that the losses created by the strategies were legitimate and in accordance with all applicable tax laws, rules, and regulations.  In particular, the Defendants advised their clients that the strategies were not a "sham transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letter from J&G would confirm this.

33.     Finally, the Defendants advised their clients that if the IRS audited their tax returns as a result of the strategies, J&G's "independent" opinion letter would confirm the propriety of the strategies and of claiming the resulting losses on their tax returns.  However, unbeknownst to their clients, J&G had already prepared the "canned" and "prefabricated" opinion letters approving the strategies, and needed only to fill in several blanks for each of the many clients to which they rendered such opinion letters.

### C. Defendants Knew or Recklessly Disregarded the Fact That They Were Selling Illegal Tax Shelters

34.     It is well known by tax professionals that under the Federal tax law, losses pursuant to "sham transactions" are not losses for tax purposes.  The basic rule of law is that taxation is based upon substance, not form, and any loss deductible for tax purposes must be an actual loss.

35.     Defendants and their Co-Conspirators relied on the complexity of the tax strategies with the hope that the IRS would not detect the illegality of the transactions.  However, the IRS discovered the trend of illegal tax shelters being marketing and sold throughout the country.

36.     On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS stated:

The Internal Revenue Service and Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for Federal income tax purposes. . . .A loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. . . .Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes.

37.     The clear message from the IRS to Defendants was that a loss arising from "a contrived series of steps" in which a taxpayer did not actually suffer the loss, will not be allowable for income tax purposes.  The Defendants completely failed to discuss and analyze the effect and significance of this IRS notice on the tax strategies sold to their clients.

38.     As a result of Notice 1999-59, the Defendants knew or recklessly disregarded the fact that, if discovered, the IRS would declare that the purported losses arising from the tax strategies they were marketing and selling were improper and not allowable for tax purposes because the loss was an "artificial loss lacking economic substance" generated "through a contrived series of steps;" however, the Defendants intentionally did not disclose this information to their clients and, indeed, told them the exact opposite.

39.     In August 2000, the IRS once again clearly and unequivocally informed tax professionals across the country that they believed the strategies such as those marketed and sold by Defendants were improper.  Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis."  This Notice concerned "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses

for taxpayers," thus indicating the IRS believed it had also addressed transactions like the strategies described herein in Notice 1999-59.

40.    Most importantly, Notice 2000-44 specifically addressed one of the types of strategies that the Defendants sold, commonly referred to as COBRA (i.e., Currency Options Bring Reward Alternatives), under which the taxpayer purchases option contracts and simultaneously writes offsetting option contracts, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] § 752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated, "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to Defendants was that non-economic tax losses arising from the current trend of entering into opposing option contracts and subsequently engaging in a series of pre-determined transactions are not properly allowable for Federal income tax purposes. These Defendants, however, simply ignored the IRS and this notice to the detriment of their clients.

41.    There is no doubt that Defendants, most who have extensive experience in the field of taxation, knew or recklessly disregarded the fact that, as a result of IRS Notices 1999-59 and 2000-44, the purported losses arising from their clients participation in tax strategies involving offsetting foreign exchange contracts would, if tracked down by the tax authorities, be disallowed for Federal or State income tax purposes; however, the Defendants intentionally failed to inform their clients of this fact.

42.    The Defendants represented that the tax strategies at issue herein were legal tax shelters despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that the shelters were illegal.  The Defendants simply ignored the clearly stated implications of IRS Notice 1999-59 and IRS Notice 2000-44 and, therefore, knowingly deceived and misled their clients to their detriment.

### D. The Formation of the Scheme to Defraud

43.    The plan to market and sell the tax strategies at issue was originally created by individuals at Deutsche Bank and Daugerdas.  Deutsche Bank acted as a strawman, creating private contracts to be entered into between Deutsche Bank and the client.   The Deutsche Bank contracts were created at the direction of J&G and others.  The contracts were not "securities" subject to the federal securities laws because they were options related to foreign currency that were not traded on a national securities exchange.

44.    Deutsche Bank was paid substantial fees for each set of contracts it created and entered into, while Deutsche Bank suffered no risk of loss for entering into the contracts.  For every contract entered into between Deutsche Bank and the client, the resulting risk established by the initial contract was eliminated by a reciprocal contract simultaneously entered into between Deutsche Bank and the client.  One contract would be drafted so that the client would be paid if the spot rate on a particular foreign currency was at or above a certain rate, and the other was drafted so that the client would have to pay out if the spot rate was at or above a certain rate. The two rates that were set (one where the client would be paid and one where the client would pay out) were the same or different by only fractions of a penny.  On all of the foreign exchange contracts, the trigger (the event that causes the payoff) occurred when the spot rate on the

underlying currency was at or above the specified spot rate on a certain date at a certain time.
There was no chance of only one position being acted upon. Either the spot rate would be above
both, so both were acted upon (but the client gets nothing because the amount that should be paid
by Deutsche Bank is offset by the amount due to Deutsche Bank), or the spot rate would be
below both, so neither were acted upon. Thus, each set of contracts were designed to result in a
loss, and therefore, Deutsche Bank, after creating and entering into the contracts with the client,
immediately gained a profit (the amount paid to Deutsche Bank for entering into the contracts).
All of the contracts written by Deutsche Bank had no business purpose or economic substance
and were used to cause unsuspecting clients to believe that they were entering into a legitimate,
possibly profitable, deal with a third party. The contracts were used to create an aura of
legitimacy to the tax strategies being sold.

45.    Each contract stated a premium that was purportedly paid by the client for
entering into the contract. Clients were advised that by entering into a series of sophisticated
transactions, they were entitled to deduct these stated premiums even though the net out-of-
pocket amount that was actually paid by the client and received by Deutsche Bank was
substantially less than the stated premiums.

46.    Clients were led to believe that the implementation of the tax strategies was
highly sophisticated and expensive. J&G required Defendants' clients to sign a confidentiality
agreement concerning the "financing structures developed by J&G." The clients had to agree
that they "shall not develop, use or market products or services similar to or competitive with the
Structures and/or Confidential Information." Because of the confidentiality of the tax strategies,
clients were required to agree that they would not disclose the strategies to any third party

without prior approval by J&G.

47.     J&G, Daugerdas, and Deutsche Bank recruited Bank One, and other banking, accounting, and law firms, to assist them in marketing the illegal tax shelters.

48.     J&G, Daugerdas, and Deutsche Bank used banking, accounting and law firms to market the illegal tax shelters because wealthy clients rely on, and place a tremendous amount of trust and faith in, the advice and recommendations of their attorneys, accountants, and advisors. As a result, J&G, Daugerdas, and Deutsche Bank knew that law, accounting, and banking firms had an established market for the illegal tax shelters and knew that if these firms recommended the illegal tax shelters as "sophisticated gain elimination strategies" to their wealthy clients, the clients would more than likely do the deal without questioning the details of the particular strategy.

49.     Although Plaintiff and many other of the Defendants' victims are successful business people, they do not have knowledge about complex tax and legal matters.  Plaintiff, like many other clients, reasonably relied on the Defendants for their expertise in this regard.

50.     J&G, Daugerdas, Deutsche Bank, and Bank One entered into an arrangement where each would receive a certain portion of the fee for each tax transaction sold.  Bank One, and the other marketing participants, were eager to participant in marketing the illegal tax shelters because the fee potential was extraordinary.  The fees were not based on an hourly rate or time spent working on the deal; rather, the fees were based solely on "the size" of the transaction. In other words, the bigger the deal, the larger the fees shared by Bank One and its Co-Conspirators.  Thus, Bank One, and the other marketing participants, had a motive to sell as many tax shelters as possible, as large as possible.

51.     After time, Bank One not only marketed the tax strategies originally created by Deutsche Bank and Daugerdas, but it became a significant player in developing, and implementing, new tax strategies that could be used to avoid detection by the IRS.  Bank One and its Co-Conspirators originally used partnerships to hold the Deutsche Bank contracts and generate sham losses for its clients, sometimes marketed under the name COBRA.  However, the IRS detected the COBRA partnership based tax schemes and issued tax notices (described above) declaring that the losses generated from these schemes were artificial and not deductible for income tax purposes.  Bank One, through its Innovative Strategies Group, which included Defendant Ohle, developed a new strategy to use to avoid detection by the IRS.

52.     Upon information and belief, Defendant Ohle approached Daugerdas about a strategy he had developed in-house (in the "Innovative Strategies Group") called a "Basis Adjusted Remainder Trust" or "BART."  Specifically, on January 1, 2001, Defendant Ohle and Trey Die of Bank One approached Daugardas at the Fountainbleau Hotel in Miami Beach, Florida, during the annual Heckerling Institute on Estate Planning and explained to him how BART worked.  On information and belief, Bank One approached J&G lawyers because J&G could not only write opinion letters purportedly legitimizing the transaction, but also already had a tremendous marketing machine in place to help promote the transaction.

53.     In summary, Die and Ohle explained that BART worked by contributing a set of Deutsche contracts to a Grantor Retained Annuity Trust, or "GRAT", and then manipulating the GRAT structure so as to increase basis in an asset the taxpayer wished to sell in the future without incurring any actual economic loss.  After a number of meetings in which Defendant Conrad and others at Bank One fully described the BART strategy, the J&G lawyers concluded

that the BART strategy was attractive because *inter alia* it was not covered by Notice 2000-44 or any listing requirements. However, they did not believe it was particularly marketable, in that it required the taxpayer to engage in the transaction prior to selling the asset giving rise to the gain.

54.    As a result, J&G and Bank One, over the next few months, reworked the BART strategy, in conjunction with Deutsche Bank and their lawyers White and Case, into one that could be used to generate a loss to offset gains that already occurred, even those involving ordinary losses. The mechanics of the HOMER strategy are more fully described in paragraph 59 of this Complaint. Daugerdas named this new strategy "HOMER," in reference to BART and the popular "Simpsons" television cartoon show.

55.    Not only did Bank One develop the strategy that formed the basis for HOMER, but Bank One used its wholly owned subsidiary, American National Bank & Trust Company of Chicago, to set up trusts to implement the HOMER strategies. After a particular HOMER strategy was consummated, American National Bank & Trust Company of Chicago would send tax documents to its clients detailing the losses and directed its clients to deduct the losses generated from the transactions on the clients' personal income tax return.

56.    Upon information and belief, Bank One and its Co-Conspirators favored the use of trusts because the American National Bank & Trust Company of Chicago reported its clients' losses to the IRS on 1099 forms, creating the appearance that an independent third party calculated the losses that the taxpayers ultimately deducted for income tax purposes. In addition, these 1099s provided no description of the losses generated by the trusts, further decreasing the chances that the IRS would discover that these deductions were derived from the same artificial losses generated from the COBRA partnership based tax scheme that it previously declared

illegal.

57.    In addition to the substantial fees paid to J&G (who kicked back a portion of these fees to Bank One), clients paid American National Bank & Trust Company of Chicago significant fees for establishing the trusts used to implement the HOMER strategies.

58.    On October 13, 2004, a *New York Times* article reported that documents from a class action lawsuit against J&G for selling the illegal tax shelters at issue, according to people who have seen the documents, revealed that J&G's "tax practice, led by Mr. Daugerdas, generated $267 million in fees from its work on tax shelters...." The article went on to state that "[o]f the $267 million, $83 million went to the firm [J&G]. Another chunk went to Mr. Daugerdas and two other lawyers at the firm. Nearly $50 million went to the financial and accounting firms that carried out the complex financial transactions for the shelters."

### E. The Features of the HOMER Strategy

59.    The steps of the HOMER Strategy were as follows:

a.    Client purchases a balanced financial position comprised of two partially offsetting European-style digital foreign currency options (the "Options"), each of which hedges the other, with a slight market bias, and each which has a premium cost in an amount roughly equal to the Target tax mitigation amount; Client borrows most funds necessary to enter into the Options (the "Loan");

b.    Client contributes the Options to a newly formed Grantor Retained Remainder Trust (the "Trust"), gifting a small unitrust interest (the "Unitrust Interest") to a relative and retaining the remainder interest in the

Trust. The Trust should be a "grantor trust" by virtue of Client's having retained the Trust's remainder interest (the "Remainder Interest"). However, the Trust provides for the creation of a power, on some subsequent date, permitting Client to reacquire Trust assets by substituting assets of equal value. Client secures the Loan with the Remainder Interest;

c.     Client sells the Remainder Interest to an unrelated third party (the "Partnership"), for its fair market value, which should roughly equal the Loan. Since Client's basis in the remainder interest is roughly equal to its value, Clients should recognize no material gain or loss upon this disposition. This payment is made with a promissory note (the "Note"). Since Client now does not own a remainder interest in the Trust, the Trust is no longer a grantor trust as to Client. Client secures the Loan with the Note. The Partnership secures the Note with the Remainder Interest;

d.     Client's power to reacquire Trust assets, by substituting assets of equal value springs into existence. The Trust is therefore now a grantor trust as to Client;

e.     The loss portion of the Options expires, and this loss flows through to Client;

f.     Client waives the right to reacquire Trust assets by substituting assets of equal value. The Trust is therefore again treated as an independent taxable entity;

g.     The Trust terminates, because the Unitrust interest is purchased by the

Partnership, and the Trust is collapsed. Upon termination, the Trust

distributes its remaining assets (i.e., the remaining Option) to the

Partnership;

h.   The Partnership liquidates, distributing its assets (i.e, the remaining

Option) and the obligation on the Note to its partners in liquidation of their

interests. This should result in the partners of the Partnership holding the

remaining Option with a basis roughly equal to the fair market value of the

remaining Option; and

i.   The partners of the Partnership terminate the remaining Option, and use

the proceeds to repay the Note.

60.   Each of these steps were fully planned in advance to reduce Plaintiff's tax

liability.

61.   Notwithstanding these "contrived series of steps", the Defendants advised

Plaintiff that the losses created by the HOMER strategy were legitimate and in accordance with

all applicable tax laws, rules, and regulations.  In particular, the Defendants advised Plaintiff that

the strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes

because Plaintiff had a legitimate business purpose -- the purchase of the private option contracts,

which had the ability to generate a profit.  Defendants failed to inform Plaintiff and their other

clients that the IRS previously found that the deductions generated from these contracts were not

legitimate.

62.   The Defendants further advised Plaintiff that if the Internal Revenue Service (the

"IRS") audited his tax returns as a result of the HOMER strategy, J&G's "independent" opinion

letter would confirm the propriety of the strategy and of claiming the resulting losses on his tax returns.

### F. The Defendants Market the Illegal Tax Shelters and Bank One Targets its Own Clients

63.     Bank One solicited buyers of the illegal tax strategies through business magazines and newspapers.  For example, in a *Utah Business* article, dated June 1, 2001, a money manager for private banking services at Bank One, boasted that many of her clients "are entrepreneurs who are likely to need special services as a result of emerging into wealth after selling their businesses."  The article went on to state "Bank One's Innovative Strategy Group, with its tax specialists, can also create sophisticated gain elimination strategies and set up asset management entities such as family limited partnerships and charitable remainder trusts."

64.     In addition, Bank One, through its private banking financial advisors, identified potential clients based on its knowledge of its clients' finances.  The clients then became "targets."

65.     For example, according to documents Plaintiff received from Bank One, on December 12, 2001, Defendant Daigle, from ISG's Louisiana branch, sent an e-mail to ISG employees in Illinois, who included Defendants Conrad, Ohle, and Deichmann, seeking advice from Defendant Conrad on the total amount of fees from the sale of plaintiff's HOMER transaction to be divided among the various parties.  She stated the "total fees were around $700,000 per a discussion Troy (he owns the relationship) had with [Plaintiff].  From a prior discussion with John [Ohle], the portion to the Bank is $180,000...."  The "Troy" mentioned in this e-mail is Troy D. Hebert, who is a financial advisor in Bank One's Middle Market Bank group and was financial advisor to Plaintiff for many years.  The e-mail went on to state that the

Middle Market Bank group of Bank One is supposed to receive revenue credit for the transaction and Daigle also stated "I would like clarification on the amount of transaction revenues to be credited against my ISG sales goals." Daigle, a member of ISG Louisiana, was part of the ISG marketing team sent to advise Plaintiff to enter into the tax strategies.

66.      As evidenced by the above e-mail, Bank One had a system in place which provided Bank One financial advisors with fees for advising their private banking clients to enter into the tax strategies at issue.

67.      Bank One financial advisors contacted their private banking clients and made one or more presentations to them. Bank One offered this advice as a part of its private banking services. The Bank One financial advisor would then set up additional meetings to allow Bank One's ISG members to meet with the "targets." Upon information and belief, during these meetings, the ISG members would present a Bank One brochure titled "Family Wealth Services" (the "Brochure"). According to the Brochure, "[T]he best measure of financial success is ... how much you are able to shelter from taxes ..."; "[O]nce your plan is complete, they [Bank One Advisors ] will work with other members of your financial advisory team—your attorney, accountant ..."; and "[O]ur [Bank One's] Advisors are 'impartial advocates' for your ongoing financial success. They do not work on commission and are not affiliated with any products or sales." However, Bank One was receiving substantial fees from J&G for each tax strategy sold. For example, according to documents received from the IRS, Bank One received $156,000 in connection with Plaintiff's HOMER strategy entered into during 2001. Bank One employees that received credit for having Plaintiff enter into the tax strategy personally benefitted from the arrangement.

68.     The Defendants would each assure the "target" that a major law firm would prepare an "independent" opinion letter confirming the propriety and legality of the strategies. The Defendants touted the reputations of J&G, Deutsche Bank, and Bank One as a means to assure the "target" that the strategies were completely legal.  The Defendants' role in the scheme was not limited to investment advice.  To the contrary, the Defendants discussed all aspects of the tax strategies with their clients, including the alleged tax benefits of the strategies and some even held themselves out as tax experts.

69.     Defendants used a standard sales pitch where clients were told that by entering into certain options contracts and then entering into a series of sophisticated transactions, they could possibly obtain a gain or a loss, but that any loss would be substantially outweighed by the tremendous tax savings generated by the transactions.

70.     The crux of the standard sales pitch was always that a major law firm (i.e., J&G) would implement the tax strategies and prepare an "independent" opinion letter confirming the propriety of the tax strategies, which would supposedly provide insurance in the event of an audit.

71.     Clients were led to believe that they was receiving unique, individualized advice and that the implementation of the tax strategies were complex and time consuming, and thus, expensive.  The greater the size of the transaction, the more it would cost to implement the transaction.

72.     However, Defendants and their Co-Conspirators were implementing the tax strategies on a mass scale.  Most, if not all, of the paperwork and contracts used to set up the entities needed to implement the tax strategies were boilerplate and only needed to be updated

with a particular client's information.

73.     In addition, J&G and Daugerdas prepared an opinion letter opining as to the propriety of its tax strategies long before the Defendants began to solicit their clients.  The opinion letter was a "canned," "prefabricated" form that was utilized, with minor changes based on the particular client, for each and every strategy sold.

74.     None of the Defendants ever disclosed to their clients that the strategies were actually created and designed by Defendants and their Co-Conspirators and that the private options contracts arranged with Deutsche Bank were designed to create a loss.

### G. Defendants Advise Plaintiff to Enter into a HOMER Strategy

75.     During early 2001, Troy Hebert, Plaintiff's long time financial advisor with Bank One, learned that Plaintiff was selling some of the assets of his business, which would cause plaintiff to personally recognize a significant amount of ordinary income and capital gain because his business was formed as a S-Corporation, and advised Plaintiff to meet with Bank One ISG representatives to discuss tax elimination strategies.

76.     Plaintiff retained his local attorney, David Lukinovch ("Lukinovich"), who specializes in tax and estate planning, and who Plaintiff regularly used for his trust and estate planning, to advise him on Bank One's tax elimination strategies.

77.     Between August 23, 2001 and October 8, 2001, the Defendants held at least three meetings with Plaintiff and/or his advisors to persuade Plaintiff to purchase option contracts and engage J&G to implement a HOMER strategy.

78.     First, the Defendants stated that Bank One offered new and unique products or strategies which could reduce or eliminate certain of Plaintiff's 2001 tax liabilities.  To impress

Plaintiff, Defendant Ohle gave his background as a tax attorney and indicated that he was involved in writing some tax code.

79.     Next, the Defendants proposed that Plaintiff purchase a series of option contracts. Defendants stated that the options contracts may produce a substantial profit or a loss, but that any loss sustained would be substantially outweighed by tax savings. Defendants advised Plaintiff to engage J&G to implement the transactions required for the tax savings in case the options contracts suffered a loss. Defendants stated that the tax strategy was legitimate because it had a business purpose and that J&G would issue a tax opinion letter opining to the legality of the strategy.

80.     At some point during these meetings, Defendant Ohle, contacted Lukinovich and told him that if Plaintiff purchased the option contracts and engaged J&G to implement a HOMER strategy, he would be paid $60,000 by J&G.

81.     Ultimately, Plaintiff decided to purchase the option contracts and engage J&G to implement a HOMER strategy. Plaintiff's decision was based on the advice, representations and recommendations of Defendants during the marketing presentations and was also based on the advice from David Lukinovich.

82.     On October 21, 2001, an attorney from David Lukinovich's office mailed to Paul Daugerdas (at J&G) a letter confirming that Plaintiff intends to purchase the options contracts.

83.     Thereafter, Mr. Penn paid approximately $528,000 to J&G for legal and implementation services, $62,000 to Bank One for trustee services and $150,000 to Deutsche Bank for the option contracts.

84.     On December 17, 2001, Lukinovich sent an invoice to J&G for the $60,000

payment which was arranged by Defendant Ohle.  J&G paid David Lukinovich the $60,000 with a check dated December 31, 2001.

85.    Plaintiff was never told by Lukinovich or the Defendants that Lukinovich would be paid $60,000 by J&G.

86.    Plaintiff believed to the contrary that Lukinovich was providing independent advice on the HOMER strategy.  Indeed, invoices from Lukinovich to Plaintiff document that Plaintiff paid approximately $6,000 to Lukinovich for his research and advice on the HOMER strategy.

87.    After Plaintiff agreed to purchase the HOMER strategy, Defendants and their Co-Conspirators caused Plaintiff to enter into the following series of transactions:

a.    On November 19, 2001, Plaintiff purchased from Deutsche Bank four

European-style options' on the Euro/U. S. Dollar exchange rate. Specifically,

Plaintiff bought (1) a reset bonus knock-out put option with a strike price of

0.971, a cap of 0.7945, a reset strike price of 0.9065, a knock-out barrier of

0.8800, a notional entitlement of 45,119,441.00 Euros, and paid a premium of

$1,978,020.00 ("Currency Option A"); (2) a reset bonus knock-out call option

with a strike price of 0.7945, a cap of 0.971, a reset strike price of 0.9065, a

knock-out barrier of 0.8800, a notional entitlement of 45,119,441.00 Euros, and

paid a premium of $2,022,020.00 ("Currency Option B"); (3) a reset bonus

knock-in put option with a strike price of 0.9710, a cap of 0.7945, a reset strike

price of 0.9065, a knock-in barrier of 0.8800, a notional entitlement of

45,119,441.00 Euros, and paid a premium of $1,981,980.00 ("Currency Option

C"); and (4) a reset bonus knock-in call option with a strike price of 0.7945, a cap of 0.9710, a reset strike price of 0.9065, a knock-in barrier of 0.8800, a notional entitlement of 45,119,441.00 Euros, and paid a premium of $2,017,980.00 ("Currency Option D," where Currency Options A, B, C, and D are hereinafter collectively referred to as the "Currency Options"). The Currency Options, which had a settlement date of November 21, 2001, were pledged as collateral on the Loan, described below.

b.       On November 19, 2001, Plaintiff also purchased from Deutsche Bank four European-style options on German government bonds. Specifically, Plaintiff bought (1) a reset bonus knock-out put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 4,113,420.00 Euros of 2 year German Government Bonds - BKO 3.75% 12 Sept 03, and paid a premium of $3,956,040.00 ("Bond Option A"); (2) a reset bonus knock-in put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 4,113,420.00 Euros of 2 year German Government Bonds - BKO 3.75% 12 Sept 03, and paid a premium of $3,963,960.00 ("Bond Option B"); (3) a reset bonus knock-out call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 4,113,420.00 Euros of 2 year German Government Bonds - BKO 3.75% 12 Sept 03, and paid a premium of $4,044,040.00 ("Bond Option C"); and (4) a reset bonus knock-in call option with a strike price of 98.45, a cap of 102.85, a reset

strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 4,113,420.00 Euros of 2 year German Government Bonds - BKO 3.75% 12 Sept 03, and paid a premium of $4,035,960.00 ("Bond Option D," where Bond Options A, B, C, and D are hereinafter collectively referred to as the "Bond Options," and the Currency Options and the Bond Options are collectively referred to as the "Options"). The Bond Options, which had a settlement date of November 21, 2001, were pledged as collateral on the Loan, described below.

c.      On November 21, 2001, Plaintiff borrowed $23,850,000 (the "Loan") from Deutsche Bank and used the proceeds of the Loan to pay for the Options. Plaintiff's net cash payment to Deutsche Bank for these transactions was $150,000.

d.      On November 23, 2001, Plaintiff transferred the Options and cash to the Trust. The Trust was formed under an irrevocable trust agreement, dated October 31, 2001 (the "Trust Agreement") with American National Bank and Trust Company of Chicago as Trustee (the "Trustee"), and is governed by Illinois law. The Trust Agreement provided that Plaintiff retained a non-contingent remainder interest (the "Remainder Interest") in the Trust, while Plaintiff made a gift of a three-year 0.02771% unitrust interest (the "Unitrust Interest") to Andrew B. Day, Jr. (the "Unitrust Beneficiary"). No other interests in the Trust were held by any persons.

e.      On December 7, 2001, Plaintiff sold the Remainder Interest to Gresham Financial Partners (the "Buyer"), a Louisiana general partnership. In consideration for the Remainder Interest, Plaintiff received an installment note obligation from the

Buyer (the "Note"). The Note was an obligation with a principal amount of $23,871,712. The Note was due and payable on September 7, 2002. The Note was pledged as collateral on the Loan, while the Options were released as collateral on the Loan.

f.    Starting on December 10, 2001, pursuant to the terms of the Trust Agreement, Plaintiff possessed the power to reacquire the Trust corpus by substituting other property of an equivalent value (the "Substitution Power").

g.    On December 13, 2001 (the "Barrier Observation Date"), Bond Options A and D and Currency Options B and C expired (collectively, the "First Expiring Options") pursuant to their terms.

h.    On December 14, 2001, the Unitrust Interest was acquired by Buyer from the Unitrust Beneficiary.

i.    On December 14, 2001, the Trust terminated with the consent of all beneficial interest holders and Plaintiff as the Settlor of the Trust, and the Trust assets, consisting of Currency Options A and D and Bond Options B and C (the "Second Expiring Options") and cash, were distributed to the Buyer as the holder of the Remainder Interest and the Unitrust Interest.

j.    On December 17, 2001, the Buyer liquidated, the Note was assumed by the Partners of the Buyer (the "Buyer Successors"), each of which was a corporation neither owned nor controlled by Plaintiff, directly or indirectly, and all assets of the Buyer, including the Second Expiring Options and the cash received upon termination of the Trust, were distributed to the Buyer Successors.

k.   On December 19, 2001, the Second Expiring Options expired pursuant to their terms. On such date, the Second Expiring Options were held by the Buyer Successors.

l.   On December 21, 2001, the Note was paid by the Buyer Successors with a payment to Plaintiff of $23,890,743.75.

m.   On December 21, 2001, Plaintiff repaid the Loan, pursuant to its terms, by making a payment to Deutsche Bank of $23,890,743.75.

88.   The documents used to implement the above stated transactions were prepared by Defendants and their Co-Conspirators, only requiring Plaintiff to sign certain of the documents.

89.   On April 8, 2002 J&G issued to Plaintiff an opinion based on the above described HOMER transaction which stated that:

> Based on the following discussion and analysis and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that under the current Internal Revenue Code and the Treasury Regulations (hereinafter referred to as the "Code" and the "Treas. Reg." or the "Treas. Regs.", respectively)[footnote omitted] and the current U.S. federal income tax law it is more likely than not that:
>
> A.   The Trust should be classified as a trust for federal income tax purposes.
>
> B.   The Options should be treated as separate instruments for federal income tax purposes; your adjusted tax basis in each Option should be the premium you paid for such Option.
>
> C.   The Trust should be treated as a grantor trust [footnote omitted] and while you owned the Remainder Interest you should be treated as the owner of the Trust for purposes of Code §671.
>
> D.   The creation and initial funding of the Trust should not cause you to recognize any taxable income; the adjusted tax basis of each Option should continue to equal the premium you paid for such Option.
>
> E.   The sale of the Remainder Interest should be a taxable

transaction to you; the Trust should cease to be treated as a grantor trust upon the sale of the Remainder Interest; the adjusted tax basis of each Option should continue to equal the premium you paid for such Option.

F.  The beginning of the term of the Substitution Power should not be a taxable event; for the duration of the Substitution Power, the Trust should be treated as a grantor trust, and you should be treated as the owner of the Trust for purposes of Code §671.

G.  The expiration of the First Expiring Options on the Barrier Observation Date should cause you to recognize loss on such expiration part of which will be an ordinary loss, and part of which will be a capital loss.

H.  You should not recognize any taxable income on the Barrier Observation Date with respect to the Second Expiring Options.

I.  The termination of the Trust and the related distribution of Trust assets to the Buyer, including the Second Expiring Options, should not cause you to recognize any taxable income.

J.  The expiration of the Second Expiring Options should not cause you to recognize any taxable income on such expiration.

K.  The step transaction, sham transaction and economic substance doctrines should not apply to disallow the results of the Transactions described herein.

L.  Code §§ 165, 465, and 469 should not apply to disallow the results of the Transactions described herein.

Each of the opinions set forth above is supported by "substantial authority," and relevant tax positions reported by you, the Trust, and the Buyer, in accordance therewith, are "more likely than not proper," as those terms are used in Code §6662.

90.    At some point after the year ended December 31, 2001, Bank One's subsidiary,

American National Bank and Trust Company of Chicago, sent Plaintiff a tax information letter

stating that his trust suffered a $7,992,000 short term loss and an other loss of $4,004,000 which

was to be deducted on Plaintiff's 2001 income tax return

91.    The Defendants promoted and advised Plaintiff to enter into the HOMER strategy

after Notice 2000-44 was issued expressly stating that these types of transactions, transactions involving the use of offsetting options contracts, were illegal and invalid. The Defendants knew that the IRS was aware of these types of transactions and that, if discovered, the IRS would disallow the losses, and impose substantial penalties. The Defendants did not disclose this important development to Plaintiff because they knew he would refuse to participate in the strategies and ask for a return of his fees.

92. Between the time the Defendants advised Plaintiff to enter into the HOMER strategy and the time Plaintiff's respective tax return was prepared, signed and filed, the Defendants never disclosed to Plaintiff the significance of IRS Notice 1999-59 and IRS Notice 2000-44 or that the tax strategies were in direct violation of Federal tax laws. The Defendants failed to advise Plaintiff that the strategies lacked a business purpose and economic substance and, in fact, advised them to the contrary. Defendants intentionally failed to disclose this material information to Plaintiff.

93. As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the Defendants and their Co-Conspirators knew or recklessly ignored, before issuing the Opinion Letter, and before Plaintiff filed his tax returns, that the IRS would probably track down every "sham" tax strategy sold by Defendants and their Co-Conspirators and declare that the purported losses arising from the strategies were not properly allowable for Federal or State income tax purposes. However, the Defendants intentionally failed to inform Plaintiff of this and, indeed, informed him to the contrary.

94. At no time prior to or subsequent to the implementation of the HOMER strategy did Defendants inform Plaintiff that the IRS contended that such transactions constituted tax

shelters within the meaning of Code § 6111 or otherwise, and that the Defendants were therefore illegally promoting an unregistered tax shelter by marketing HOMER. The Defendants failed to inform Plaintiff of these facts and, in fact, advised him to the contrary.

95.     The Defendants and their Co-Conspirators conspired to devise and promote the HOMER strategy for the purpose of receiving and splitting millions of dollars in fees. The receipt of those fees was the primary, if not sole, motive in the development and execution of the tax transactions. Further, the amount of fees earned by the Defendants was not tied to or reflective of the amount of time and effort they expended in providing financial services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns. Indeed, Defendants and their Co-Conspirators devised the transaction and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the tax strategies by agreeing to the representations that would be made and issuing the allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

96.     The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' conduct; the provision of professional advisory services to clients was merely an incidental byproduct of, not a motivating factor for, Defendants' conduct alleged herein. Further, the Defendants' and their Co-Conspirators arrangement gave each of the Defendants a significant pecuniary interest in the advice and professional services they would render.

97.     The Defendants and their Co-Conspirators had a financial, business, and property interest in inducing Plaintiff, as well as other clients, to enter illegal tax shelters, and to do so,

promised, opined and assured that the shelters would enable their clients to have a reasonable opportunity to make a profit and at the same time legally reduce their taxes.

98.    Plaintiff lost a significant amount of money in carrying out the HOMER strategy, including approximately $528,000 paid to J&G for implementing the tax strategy (from which $156,000 was paid to Bank One and $60,000 paid to David Lukinovich), $150,000 paid to Deutsche Bank for entering into the option contracts created in connection with the HOMER strategy, and $62,000 paid to Bank One's American National Bank & Trust Company of Chicago for trustee services in connection with the trust created to implement the HOMER tax scheme.

99.    Plaintiff also incurred and is continuing to incur significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against him and the IRS is attempting to assess well over $1 million in penalties and interest for the taxes which were avoided due to the HOMER strategy.  All together, Plaintiff alone has incurred over $2 million in damages from the HOMER transaction that the Defendants have advised and persuaded him to enter into.

100.    Defendants and their Co-Conspirators, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the sale of tax strategies, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff.  Further, Defendants made various false statements of material fact, and omitted to state material facts which made statements misleading, to Plaintiff.

101.    The purpose and effect of Defendants' plan, transaction, and course of conduct was to generate huge fees by co-promoting alleged tax-savings strategies.

102.     Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  In this regard, Defendants' acts and omissions included, *inter alia*, failing to disclose to Plaintiff that this strategy was designed, created, and implemented by Defendants and their Co-Conspirators, that the Deutsche Bank contracts had no real opportunity for Plaintiff to make a profit, and that the tax strategies had no business purpose or economic substance.

103.     As a result of and in reliance on these misrepresentations, omissions, and promises, Plaintiff engaged in the HOMER strategy.

104.     Had Plaintiff known of the material adverse information which Defendants did not disclose, he would not have engaged in the HOMER strategy.

105.     The Defendants owed duties to Plaintiff.  These duties included the duty to:

    a.     Exercise prudence, caution and care in recommending financial and tax advice; and

    b.     Exercise their responsibility to deal fairly and in good faith and their fiduciary responsibilities of care and loyalty to Plaintiff.

106.     Defendants breached their duties for personal gain.  Defendants intended to deceive Plaintiff, as evidenced by the aggressive push Defendants took, directly and through marketing programs and briberies, to convince Plaintiff to enter into illegal tax shelters. Defendants intentionally deceived Plaintiff by advising him to enter into contracts on the premise that he could make a profit, when Defendants knew or recklessly disregarded the fact that the contracts would not be profitable.  Further, Defendants knew or recklessly disregarded the fact

that the HOMER strategy would be disallowed if detected by the IRS. These transactions were perpetrated through Defendants' discrete acts of misrepresentation.

## FIRST CLAIM FOR RELIEF

### Civil Violations of the Racketeer Influenced and Corrupt Organizations Act

107.    Plaintiff repeats and realleges each and every prior allegation as if fully set forth herein.

108.    Plaintiff is a "person" within the meaning of 18 U.S.C. §1964(c).

109.    At all times relevant hereto, the Plaintiff and the Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

110.    An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

111.    The enterprise at issue in this case, for purposes of 18 U.S.C. §§1961(3) and 1962(a), 1962(b), 1962(c) and 1962(d), is an association-in-fact of all Defendants and non-defendant Co-Conspirators referred to herein as "the Enterprise." Additional wrongdoers that may be part of the association-in-fact enterprise (sometimes referred to herein as "Member" or "Members") include the individual Defendants themselves, those employees and agents of the Defendants and other non-defendant entities or co-conspirators that participated in the fraudulent representations to Plaintiff, its other clients, the public, the courts, and various regulatory and enforcement agencies.

112.    While the Defendants participated in the Enterprise and were a part of it, the Defendants also have an existence separate and distinct from the Enterprise.

113.    Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

114.    Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

115.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

116.    Defendants and all other Members of the Enterprise worked together to orchestrate the pursuit of customer prospects; the promotion and the sale of illegal tax shelters; and shared fees, costs, information, resources, and the fruits of its predicate acts.  The association-in-fact enterprise, Defendants and other Members of the Enterprise, was a formal, ongoing relationship which functioned as a continuing unit, pursuing a course of conduct as set forth above (i.e., the pursuit of customer prospects, and the promotion and the sale of the illegal tax shelters), with a common or shared purpose (i.e., to convince potential clients to allow it to attempt to eliminate those clients' tax liabilities, all the while charging exorbitant fees) and continuity of structure and personnel.

117.    Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§1962(a) and (b), and have conspired to violate § 1962(c) in violation of §1962(d) by pursuing and soliciting clients, designing, creating, engineering, implementing, marketing, promoting and/or selling and inducing the purchase of transactions which were designed to reduce or eliminate tax liability and which have been, or

will be, determined by the IRS to be illegal and/or abusive tax shelters under Federal tax laws, IRS Notice 1999-59 or IRS Notice 2000-44.

## Defendants' Scheme

118.    For a substantial period of time, the Defendants knowingly, intentionally and directly participated in, or counseled, commanded, induced, procured or caused and conspired in the pursuit of and solicitation of and eventual inducement of Plaintiff to participate in tax strategies, which were designed to reduce or eliminate tax liability, by means of false or fraudulent representations or promises by the use of the mails and/or wires for purposes of the execution of their scheme.  In furtherance of their scheme, Defendants failed to reveal to the Plaintiff the number of other participants that were pursued and solicited by the Enterprise for placement into, and that actually were induced to participate in, these same or similar tax strategies which the Enterprise knew, and was in the best position to know that the tax strategies would not withstand the challenge and/or scrutiny of the IRS.  This was not a single scheme intended to induce one sole victim to do anything; the Members of the Enterprise schemed to pursue and solicit several hundred, if not more than a thousand, victims, as evidenced by 1) the multiple reported cases filed against various Members of the Enterprise with the same operative facts; 2) a July 1, 2004 IRS announcement of a turnout of more that 1,500 taxpayers electing to settle with the IRS for participating in the illegal or abusive tax shelters sold by the Enterprise; and 3) recent reports that J&G generated over $250 million in fees for its role in implementing illegal tax strategies and issuing opinion letters validating the strategies, over $50 million of which went to banking institutions like Bank One.  Moreover, Bank One sold HOMER strategies to approximately many other unsuspecting clients.

119.    Most of the Bank One's victims were existing clients. For instance, Plaintiff, a long time Bank One client, was targeted by a Bank One private banking financial advisor, Troy D. Hebert, and was subsequently defrauded by the Enterprise.

120.    The more clients that the Defendants pursued, solicited and eventually induced to participate in the scheme, the more money it would earn. Moreover, other Members and co-conspirators of the Enterprise were paid out of the fees paid by Plaintiff to the Enterprise, in many cases without the knowledge of Plaintiff, in furtherance of the Enterprise. For example, after Bank One was served with a summons from the IRS for information relating to Bank One's tax shelter promotion activities with J&G, Plaintiff received from Bank One documents held by J&G and Bank One which included a fee agreement between Bank One and J&G, whereby J&G agreed to pay Bank One $156,000 for its role in securing the Plaintiff's engagement of J&G with respect to the HOMER tax strategy.

121.    Prior to and during all transactions relative hereto, the Enterprise represented to Plaintiff that the HOMER strategy was new and unique and as such, not substantially similar to transactions that had been deemed abusive by the IRS in official notices and announcements. In fact, the Enterprise knew or recklessly disregarded the fact that the tax strategies they were marketing and promoting were substantially similar to prior strategies found abusive by the IRS, and, as such, would be intensely scrutinized by the federal and state tax authorities and regarded as illegal tax shelters.

122.    The fees paid by the Plaintiff enabled the Enterprise to pursue, solicit and induce other individuals and entities to participate in the tax strategies at issue. The fees were reinvested into the Enterprise in order to fund the Enterprise, using or investing, directly or indirectly, part

of the income, or the proceeds of such income, gained from the pattern of racketeering activity alleged herein back into the Enterprise in order to be able to pursue additional clients and induce them to participate in the scheme set forth herein.  Defendants and their Co-Conspirators invested the money back into the Enterprise in order to provide the funding to market their tax strategies to other high net-worth individuals and/or business entities, which also caused injury to Plaintiff since the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold compromised the viability of all of the transactions globally.  It is the policy of the IRS to apply the federal tax laws fairly and uniformly to all taxpayers.  Thus, although the Defendants knew or recklessly disregarded the fact that the tax scheme they promoted would be deemed illegal and/or abusive, the sheer volume of transactions sold by the Enterprise and the resulting extraordinary loss in tax dollars to the government foreclosed any possibility that the tax authorities would find in favor of the Plaintiff.

123.     While soliciting Plaintiff, but before J&G delivered an actual tax opinion, the Enterprise, through Defendant Ohle, expressly and repeatedly represented to Plaintiff that:

     i.      the HOMER strategy was highly defensible;

     ii.     if the HOMER strategy was challenged by the IRS, at worst, the IRS would settle at a substantial discount of the tax liability otherwise due; and

     iii.    due to the underlying defensibility of the HOMER strategy and the litigation risk to the IRS, Plaintiff would not have to pay interest or penalties.

124.     On April 8, 2002, months after the Enterprise had pursued and solicited Plaintiff,

and months after the Plaintiff had paid the exorbitant fees to the Defendants and other Members of the Enterprise, Plaintiff received a legal opinion from J&G, backdated to January 9, 2002, and other information necessary to complete tax returns with respect to the transactions at issue. The opinions Plaintiff received stated in pertinent part: "we are of the opinion that the described tax consequences have substantial authority and that it is more likely than not that you should prevail if challenged by the IRS."

125.    On June 16 2004, Plaintiff was notified by the IRS that J&G may have issued him an independent tax opinion letter without disclosing it also promoted the tax shelter.

126.    Plaintiff was denied the opportunity to make a well-reasoned business decision regarding the risks involved in engaging in the schemes concocted by the Enterprise due to various misrepresentations and failures to disclose made by the Enterprise. In particular, Bank One, through Defendants Ohle, and among others, made misrepresentations to Plaintiff about the defensibility and validity of the HOMER strategy as set forth above.

127.    The Enterprise never fully disclosed the risks or clearly articulated the nature of the transactions to Plaintiff and, in fact, completely misrepresented the worst case scenario to the Plaintiff.

## Predicate Acts

128.    With respect to the activities alleged herein, the Enterprise acted at all times with malice toward Plaintiff, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiff. These predicate acts were acts of deception which furthered the goal of soliciting clients to participate in what the Enterprise knew or should

have known was fraudulent and would be deemed abusive by the IRS. Specifically, the Enterprise knew that certain of its strategies had been deemed abusive by the IRS and that "new" strategies that they were promoting were not different enough to survive inspection or investigation by the IRS.

129.    Each Member of the Enterprise agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining fees to which the Enterprise was not entitled.

130.    With respect to the overt acts and activities alleged herein, each Member of the Enterprise conspired with each other non-defendant entity or co-conspirator to violate 18 U.S.C. §§1962(a), (b) and (c), all in violation of 18 U.S.C. § 1962(d). In violation of § 1962(c), each Member of the Enterprise agreed and conspired with each other Member, including others not named as defendants in this matter, to: 1) pursuant to § 1962(a), invest fees paid by Plaintiff and other participants into pursuing and soliciting other clients, inducing and causing other individuals and business entities to participate in illegal tax strategies; and 2) pursuant to § 1962(b), acquire or maintain property interests to which the Enterprise was not entitled through its racketeering activity by charging exorbitant fees for tax strategies it knew would be deemed unacceptable by the IRS.

131.    The Enterprise and its individual Members exceeded any legitimate role of diligent tax or financial advisers by designing, creating, engineering, implementing, marketing, promoting and/or selling a series of these tax strategies in an attempt to conspire to obtain money in the form of fees and commissions, knowing that the underlying strategies were not defensible to the IRS. Upon information and belief, the Enterprise participated in some of these

transactions via partnerships that it formed to make the strategies perform. Many of these tax strategies have been and/or likely will be deemed illegal and/or abusive pursuant to federal tax laws.

132.    The Enterprise's schemes have resulted in severe financial loss to Plaintiff. Moreover, as a result of the Enterprise's wire fraud and mail fraud violations, Plaintiff has suffered extensive monetary damages consisting of unexpected tax liability, fees and commissions paid to the Enterprise, as well as interest and penalties which the IRS will likely seek. Plaintiff has also suffered additional damages, including but not limited to opportunity costs, additional legal, tax advisor and accountant fees and reputation damage.

133.    The Enterprise's documents and communications associated with the schemes at issue contained false and/or misleading representations, including but not limited to assertions that:

a.    No penalties would or could be assessed by the IRS or state taxing authorities because the transaction's unique characteristics and the opinion itself provided complete "penalty protection;"

b.    These strategies were new and unique and would not be subject to the same scrutiny as other potentially illegal and abusive strategies that had been identified by the IRS in its earlier Notices and/or Announcements;

c.    The tax legal opinion it provided was highly defensible;

d.    If the strategies were challenged by the IRS, at worst, the IRS would settle at a substantial discount of the tax liability otherwise due;

e.    Due to the underlying defensibility of the opinion to the Plaintiff and the litigation

risk to the IRS, Plaintiff would not have to pay interest or penalties; and

f.      The private contracts entered into with Deutsche Bank could be very profitable.

134.    These misrepresentations constitute "false or fraudulent pretenses, representations or promises" within the meaning of the mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343) provisions.

135.    All of the Members of the Enterprise actively participated in this elaborate and abusive scheme to obtain money from Plaintiff, even those not named as defendants in this matter.

136.    In carrying out the overt acts and fraudulent transactions described herein, the Defendants engaged in conduct in violation of various state and federal laws and regulations, including but not limited to 18 U.S.C. §§1341, 1343, 1346 and 1961 et seq, and both state and federal banking laws.

137.    18 U.S.C. 1961(1) provides that "racketeering activity means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), § 1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud).

## Violations of 18 U.S.C. Sections 1341 and 1343

138.    For the purpose of executing and/or attempting to execute its transactions to defraud and to obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories for mail, matter and things to be sent or delivered by the Postal Service and/or deposited or caused to be deposited matter or things to be sent or delivered by a private or commercial interstate carrier, and received matter and things therefrom including but not limited

to contracts, instructions, correspondence, opinion letters, and other items.

139.    Specifically, for example, (1) on October 31, 2001, Paul Daugerdas, on behalf of J&G, mailed to Plaintiff's local counsel a set of documents to be executed by Plaintiff in connection with the tax strategies, which included a Deutsch Bank account form, a document related to a trust created by American National Bank and Trust Company of Chicago to implement the tax strategy, and a spousal consent form; (2) American National Bank and Trust Company of Chicago mailed tax documents to Plaintiff which stated that he had suffered a substantial short term loss in his irrevocable trust and directed him to deduct this loss on his personal income tax return for the tax year ended December 31, 2001; and (3) on April 8, 2002, J&G mailed Plaintiff a letter with an approximately 100-page tax legal opinion, which J&G backdated to January 9, 2002, and which stated that, among other things, Plaintiff was more likely than not entitled to deduct his losses reported to him by American National Bank and Trust Company of Chicago.

140.    For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things therefrom, including but not limited to contracts, instructions, correspondence, opinion letters, funds and other things.

141.    Specifically, for example, (1) On October 17, 2001, J&G faxed a confidentiality agreement to Plaintiff's local counsel requiring that Plaintiff and his counsel agree to keep the tax strategies at issue confidential; (2) On October 17, 2001, Defendant Conrad faxed to J&G an information questionnaire, which included transaction information for Plaintiff, including the

amount of the transaction, the annual income and net worth of the Plaintiff, and the referring bank; (3) On November 9, 2001 Defendant Deichmann faxed Plaintiff instructions to wire funds to Deutsche Bank, which included Deutsche Bank account information; and (4) on December 12, 2001, Defendant Daigle, from ISG's Louisiana branch, sent an e-mail to ISG employees in Illinois, who included Defendants Conrad, Ohle, and Deichmann, seeking advice from Defendant Conrad on the total amount of fees to be divided among the various parties and confirming that the portion to be paid to Bank One was $180,000.

142.    The Enterprise's use of the mails and wires includes private and public components.

143.    The Enterprise, including all of the individual Defendants, in order to carry out the HOMER tax strategy utilized mail, wires, e-mails, and telephone calls to and from Louisiana or Chicago, and Deutsche Bank located in the Southern District of New York.

144.    In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, the Enterprise falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiff, in violation of 18 U.S.C. §§1341 and 1343, including but not limited to the following:

    a.    Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

    b.    Falsely claiming that the transactions and the to-be-received tax opinion would protect Plaintiff from any tax penalties;

    c.    Misrepresenting the likelihood that Plaintiff would prevail should a dispute arise with taxing authorities;

d.      Failing to advise that the transaction had no business purpose and no economic substance;

e.      Failing to disclose that the IRS had previously issued official notices and announcements deeming substantially similar tax strategies to be abusive and/or illegal;

f.      Failing to disclose the collective number of similar strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of Plaintiff;

g.      Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

h.      Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

i.      Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

j.      Informing the Plaintiff that the transactions were not "sham transactions" that would be ignored or disallowed for tax purposes;

k.      Advising, recommending, instructing, and assisting Plaintiff in engaging into a transaction which he was advised had business purpose and economic substance and made investment sense;

145.   The Enterprise intentionally and knowingly made these misrepresentations and intentionally and knowingly suppressed material facts from Plaintiff for the purpose of deceiving him and thereby obtaining financial gain.   The Enterprise either knew or recklessly disregarded that the misrepresentations and omissions described herein were material.   Plaintiff justifiably relied on the misrepresentations and omissions in carrying out the transactions and in subsequently filing his tax returns.

146.   Plaintiff therefore been injured in his business or property by the Enterprise's overt acts and racketeering activities.

### Pattern of Racketeering Activity

147.   The violations set forth herein constitute "racketeering activities" or "predicate acts" within the meaning of 18 U.S.C. § 1961(1), and include but are not limited to:

a.   Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.   Falsely claiming that the transactions and the to-be-received tax opinion would protect Plaintiff from any tax penalties;

c.   Misrepresenting the likelihood that Plaintiff would prevail should a dispute arise with taxing authorities;

d.   Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

e.   Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible

because the contracts where designed to result in a loss;

f.      Failing to disclose the actual roles of the Members of the Enterprise,
        including Deutsche Bank;

g.      Informing Plaintiff that the transactions were not "sham transactions"
        that would be ignored or disallowed for tax purposes;

h.      Advising, recommending, instructing, and assisting Plaintiff in engaging into a
        transaction which he was advised had business purpose and economic substance
        and made investment sense;

i.      Failing to advise that the transaction had no business purpose and no economic
        substance;

j.      Misrepresenting the volume of similar transactions pursued, solicited and
        originated by The Enterprise, specifically leading Plaintiff to believe it was the
        one of a select few clients with whom the Defendants were working to attempt to
        eliminate tax liability in this manner;

k.      Taking advantage of a relationship of trust and confidence and using its
        knowledge of Plaintiff's finances to pursue and solicit and eventually induce
        Plaintiff to participate in tax strategies concocted by the Enterprise;

l.      Charging and collecting unreasonable, excessive, and unethical fees;

m.      Failing to reveal to Plaintiff the number of other participants in similar schemes,
        which Plaintiff has since discovered numbered in the hundreds and in fact
        probably exceeded a thousand;

n.      Illegally promoting an unregistered tax shelter by marketing it to Plaintiff;

o.  Failing to disclose to Plaintiff that if he filed tax returns claiming capital and ordinary losses based on the HOMER strategy, he would be liable to taxing authorities including the IRS for penalties and interest;

p.  Advising Plaintiff that the capital and ordinary losses created by the HOMER strategy were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

q.  Representing and advising Plaintiff that the various entities formed to carry out the HOMER strategy had a business purpose as well as economic substance;

r.  Directing and assisting Plaintiff in making cash contributions to various entities formed for the purpose of carrying out the HOMER strategy;

s.  Defendants' directing, instructing, and assisting Plaintiff in carrying out each of the steps of the scheme concocted by Defendants and other Members of the Enterprise, including directing Plaintiff to sign authorizations and agreements with third parties other than Defendants;

t.  Failing to advise, recommend, and instruct Plaintiff to amend his tax returns, timely or otherwise;

u.  Advising Plaintiff that the tax strategies concocted by the Enterprise were valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

v.  Providing erroneous legal, banking, financing, and tax opinions and advice; and

w.  Enticing, recommending, advising, assisting and directing Plaintiff to enter into a transaction that, unbeknownst to Plaintiff, would be deemed abusive and improper and would be disallowed and held invalid by the IRS on the grounds that the

transaction lacked economic substance, had no business purpose, was a "sham transaction," and violated the step transaction, sham transaction, and economic substance doctrines, despite the representations to the contrary in the tax legal opinions provided by the Enterprise.

148.    The Enterprise has engaged in a "pattern of racketeering activity," as defined in § 1961of RICO, by committing and/or conspiring to commit a transaction with at least two such acts of racketeering activity, as described specifically herein, within the past ten years.  In fact, upon information and belief, each of the Members of the Enterprise and its co-conspirators have committed at minimum several hundred of acts of racketeering activity. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting similar victims, including Plaintiff.

149.    The Enterprise's innumerable racketeering activities or predicate acts are related and also amount to a continuous criminal activity.

150.    These predicate acts are related in the sense that they have the same purpose (to carry out the scheme described herein); result (to obtain money); victims (such as Plaintiff and others); method of commission (the scheme described herein); and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose.

151.    The predicate acts were committed in the same manner, and they constituted the Enterprise's "normal" way of doing business with regard to pursuing and soliciting clients, inducing them to participate and then giving tax strategy advice.  Defendants are also engaged in banking activities separate and apart from the scheme described herein, and their unlawful

actions which constitute the predicate acts giving rise to this RICO claim (set forth herein) are within their "normal" and "regular" way of doing business.

152.    The Enterprise's course of action entails a span of years, during which Defendants committed numerous, related predicate acts, as set forth specifically herein, as part of its continuing scheme. Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning and structure of the operations described herein in the persecution of Plaintiff and the Enterprise's several hundred, perhaps over a thousand, other victims.

153.    The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to by Defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment and Unjust Enrichment

154.    Plaintiff repeats and realleges each and every prior allegation as if fully set forth herein.

155.    An actual, justiciable controversy exists between Plaintiff on the one hand and the Defendants and other Members of the Enterprise on the other.

156.    Had Plaintiff not been pursued, solicited and enticed to enter into the tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise, he would not have paid fees to the Defendants and other Members of the Enterprise. Plaintiff seeks a declaration that, due to the foregoing lack of consideration, the Enterprise has been unjustly enriched and all fees paid to the Enterprise, including but not limited to fees paid to

non-defendant co-conspirator Members, should be returned to Plaintiff.

## THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty

157.    Plaintiff repeats and realleges each and every prior allegation as if fully set forth herein.

158.    The Enterprise was Plaintiff's fiduciary, and thus owed to Plaintiff the duties of honesty, loyalty, care and compliance.

159.    The Enterprise breached its fiduciary duty to Plaintiff by advising him to engage in a tax strategy designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise in reliance on its advice, representations, recommendations, instructions, and opinions, which the Enterprise knew or should have known to be improper and illegal, based on the members of the Enterprise's prior experience with similar strategies which they had also promoted and which had been deemed abusive by the IRS, for the purpose of generating huge fees for the Enterprise.

160.    The Enterprise breached its fiduciary duties to Plaintiff by, among others, the following acts and/or omissions:

a.    Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.    Falsely claiming that the transactions and the to-be-received tax opinion would protect Plaintiff from any tax penalties;

c.    Misrepresenting the likelihood that Plaintiff would prevail should a dispute arise with taxing authorities;

d.      Failing to notify Plaintiff that the Enterprise and its co-conspirator Members

schemed to pursue, solicit, induce, and then place several hundred, if not more

than a thousand, customers into similar tax strategies with full knowledge that

they would not pass IRS muster;

e.      Misrepresenting the volume of similar transactions in which J&G, the Member of

the Enterprise that actually provided the tax legal opinion, produced opinions;

f.      Failing to disclose the true likelihood that the IRS would not accept the tax

treatment of these transactions as indicated in the opinion letter, based on the

transactions' similarity to other transactions that had been deemed abusive and

which had also been designed, created, engineered, implemented, marketed,

promoted and/or sold by the Enterprise;

g.      Failing to disclose the collective number of similar strategies and/or transactions

that the Enterprise designed, created, engineered, implemented, marketed,

promoted and/or sold, which foreclosed any possibility that the tax authorities

would find in favor of the Plaintiff;

h.      Failing to ensure that the transactions into which the Enterprise advised Plaintiff

to enter complied with applicable State and Federal Rules and Regulations;

i.      Taking advantage of a relationship of trust and confidence and using its

knowledge of Plaintiff's finances to pursue and solicit and eventually induce

Plaintiff to participate in tax strategies concocted by the Enterprise;

j.      Advising and recommending that Plaintiff engage in the HOMER strategy;

k.      Charging and collecting unreasonable, excessive, and unethical fees;

l.   Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

m.   Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

n.   Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

o.   Informing Plaintiff that the transactions were not "sham transactions" that would be ignored or disallowed for tax purposes;

p.   Advising, recommending, instructing, and assisting Plaintiff in engaging into a transaction which he was advised had business purpose and economic substance and made investment sense;

q.   Failing to advise that the transaction had no business purpose and no economic substance;

r.   Failing to reveal to Plaintiff the number of other participants in similar schemes, which Plaintiff has since discovered numbered in the hundreds and in fact probably exceeded a thousand;

s.   Illegally promoting an unregistered tax shelter by marketing it to Plaintiff;

t.   Failing to disclose to Plaintiff that if he filed tax returns claiming capital and ordinary losses based on the HOMER strategy, he would be liable to taxing authorities including the IRS for penalties and interest;

u.      Advising Plaintiff that the capital and ordinary losses created by the HOMER strategy were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

v.      Representing and advising Plaintiff that the various entities formed to carry out the HOMER strategy had a business purpose as well as economic substance;

w.      Directing and assisting Plaintiff in making cash contributions to various entities formed for the purpose of carrying out the HOMER strategy;

x.      Directing, instructing, and assisting Plaintiff in carrying out each of the steps of HOMER strategy, including asking Plaintiff to sign authorizations and agreements;

y.      Failing to advise, recommend, and instruct Plaintiff to amend his and tax returns, timely or otherwise;

z.      Failing to advise, recommend and/or instruct Plaintiff to amend his tax returns in light of IRS Notices or Announcements or otherwise;

aa.      Advising Plaintiff that the HOMER strategy was valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

bb.      Providing erroneous legal, banking, financing, and tax opinions and advice; and

cc.      Enticing, recommending, advising, assisting and directing Plaintiff to enter into a transaction that, unbeknownst to the Plaintiff, would be deemed abusive and improper and would be disallowed and held invalid by the IRS on the grounds that the transaction lacked economic substance, had no business purpose, was a "sham transaction," and violated the step transaction, sham transaction, and economic

substance doctrines, despite the representations to the contrary in the tax legal opinions provided by the Enterprise.

161.    As a result of the Enterprise's conduct set forth herein, Plaintiff has suffered injury in that he, among other things: 1) paid to the Defendants and other Members of the Enterprise exorbitant fees; 2) took undue financial risk; 3) likely will incur tax penalties and interest; 4) have incurred opportunity costs; 5) have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation; 6) have incurred reputation damage; and 7) have foregone alternative tax opportunities.

## FOURTH CLAIM FOR RELIEF

### Fraud

162.    Plaintiff repeats and realleges each and every prior allegation as if fully set forth herein.

163.    The Enterprise made misrepresentations to Plaintiff for the purpose of inducing him to participate in its schemes and to pay the Enterprise enormous sums of money.

164.    In order to induce the Plaintiff to pay it exorbitant fees, the Defendants and other Members of the Enterprise made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiff, including but not limited to:

a.      Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.      Falsely claiming that the transactions and the to-be-received tax opinions would protect Plaintiff from any tax penalties;

c.      Misrepresenting the likelihood that Plaintiff would prevail should a dispute

arise with taxing authorities;

d.      Misrepresenting the volume of similar transactions pursued, solicited and originated by the Enterprise, specifically leading Plaintiff to believe he was one of a small group whom the defendants were working to attempt to eliminate tax liability in this manner;

e.      Misrepresenting the volume of similar transactions in which J&G, the Member of the Enterprise that actually provided the tax legal opinion, produced opinions;

f.      Failing to disclose the true likelihood that the IRS would not accept the tax treatment of these transactions as indicated in the opinion letter, based on the transactions' similarity to other transactions that had been deemed abusive and which had also been designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise;

g.      Failing to disclose the collective number of the similar strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of Plaintiff;

h.      Taking advantage of a relationship of trust and confidence and using its knowledge of Plaintiff's finances to pursue and solicit and eventually induce Plaintiff to participate in tax strategies concocted by the Enterprise;

i.      Charging and collecting unreasonable, excessive, and unethical fees;

j.      Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense,

and had no business purpose or economic substance;

k.    Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

l.    Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

m.    Informing the Plaintiff that the tax strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

n.    Advising, recommending, instructing, and assisting Plaintiff in engaging into a transaction which he was advised had business purpose and economic substance and made investment sense;

o.    Failing to advise that the transactions had no business purpose and no economic substance;

p.    Failing to reveal to Plaintiff the number of other participants in similar schemes, which Plaintiff has since discovered numbered in the hundreds, and in fact probably exceeded a thousand;

q.    Illegally promoting an unregistered tax shelter by marketing it to Plaintiff;

r.    Failing to disclose to Plaintiff that if he filed tax returns claiming capital and ordinary losses based on the HOMER strategy, he would be liable to taxing authorities including the IRS for penalties and interest;

s.    Advising Plaintiff that the capital and ordinary losses created by the HOMER strategy were legitimate, proper, and in accordance with all applicable tax laws,

rules and regulations;

t.    Representing and advising Plaintiff that the various entities formed to carry out the HOMER strategy had a business purpose as well as economic substance;

u.    Directing and assisting Plaintiff in making cash contributions to various entities formed for the purpose of carrying out the HOMER strategy;

v.    Directing, instructing, and assisting Plaintiff in carrying out each of the steps of HOMER strategy, including asking Plaintiff to sign authorizations and agreements;

w.    Failing to advise, recommend, and instruct Plaintiff to amend his tax returns, timely or otherwise;

x.    Advising Plaintiff that the HOMER strategy was valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

y.    Failing to ensure that the transactions into which the Enterprise advised Plaintiff to enter complied with applicable State and Federal Rules and Regulations;

z.    Providing erroneous legal, banking, financing,  and tax opinions and advice; and enticing, recommending, advising, assisting and directing Plaintiff to enter into a transaction that, unbeknownst to Plaintiff, would be deemed abusive and improper and would be disallowed and held invalid by the IRS on the grounds that the transaction lacked economic substance, had no business purpose, was a "sham transaction," and violated the step transaction, sham transaction, and economic substance doctrines, despite the representations to the contrary in the tax legal opinions provided by the Enterprise; and

aa.   Failing to disclose that the Enterprise paid $60,000 to Plaintiff's local attorney to make sure that Plaintiff entered into the HOMER strategy.

165.   The above intentional omissions of material fact and/or affirmative representations made by the Defendants and other Members of the Enterprise and its co-conspirators were false or were likely to be false when made and the Enterprise knew or recklessly disregarded the fact that these representations were false when made with the intention that Plaintiff rely on them in deciding whether or not to take the advice of the Defendants and other Members of the Enterprise and thereby pay it exorbitant fees and commissions.  In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by Defendants and other Members of the Enterprise with the intent to induce Plaintiff to enter into an abusive tax strategy and pay it exorbitant fees.

166.   In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regard the transactions at issue, Plaintiff paid to the Defendants and other Members of the Enterprise exorbitant fees to execute the transactions, did not avail himself of alternative tax opportunities, filed federal and state tax returns that have been and/or likely will be deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend his tax returns.

167.   But for the Enterprise's intentional misrepresentations and material omissions described herein, Plaintiff would never have engaged the Enterprise for advice on his tax planning, engaged in the transactions at issue, claimed the purportedly resulting capital and/or ordinary losses on his income tax returns, filed and signed his tax returns in reliance on the advice of the Enterprise, failed to amend his tax returns, and/or failed to avail himself of other

alternative tax opportunities.

168.     After discovering the Enterprise's fraud, Plaintiff incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation. As a result of the Enterprise's conduct set forth herein, Plaintiff suffered injury in that he, among other things: 1) paid to the Defendants and other Members of the Enterprise exorbitant fees, 2) took undue financial risk, 3) likely will incur tax penalties and interest, 4) has incurred opportunity costs; 5) has and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, 6) has incurred reputation damage, and 7) has foregone alternative tax opportunities.

169.     As a proximate result of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence.

## FIFTH CLAIM FOR RELIEF

### Negligent Misrepresentation

170.     Plaintiff repeats and realleges each and every prior allegation as if fully set forth herein.

171.     The Enterprise owed Plaintiff duties of care, loyalty and honesty, and a duty to comply with the applicable standards of care.

172.     During the course of its dealings with Plaintiff, the Enterprise made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of fact, and gave numerous recommendations, advice, instructions, and opinions to Plaintiff, including but not limited to:

a.  Misrepresenting the proposed transactions as unique and/or distinct from those previously designed by Members of the Enterprise itself and by other promoters;

b.  Falsely claiming that the transactions and the to-be-received tax opinion would protect Plaintiff from any tax penalties;

c.  Misrepresenting the likelihood that Plaintiff would prevail should a dispute arise with taxing authorities;

d.  Providing erroneous legal, banking, financing, and tax opinions and advice;

e.  Misrepresenting the volume of similar transactions in which J&G, the Member of the Enterprise that actually provided the tax legal opinion, produced opinions;

f.  Failing to disclose the true likelihood that the IRS would not accept the tax treatment of these transactions as indicated in the opinion letter, based on the transactions' similarity to other transactions that had been deemed abusive and which had also been designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise;

g.  Failing to disclose the collective number of similar strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of Plaintiff;

h.  Failing to ensure that the transactions into which the Enterprise advised Plaintiff to enter complied with applicable State and Federal Rules and Regulations;

i.  Taking advantage of a relationship of trust and confidence and using its knowledge of Plaintiff's finances to pursue and solicit and eventually induce

Plaintiff to participate in the HOMER strategy;

j.     Advising and recommending that Plaintiff engage in the HOMER strategy;

k.     Charging and collecting unreasonable, excessive, and unethical fees;

l.     Failing to disclose that the private contracts entered into with Deutsche Bank had no real opportunity of generating a profit, made no economic or investment sense, and had no business purpose or economic substance;

m.     Informing Plaintiff that he had an opportunity of making a profit on the private contracts with Deutsche Bank when, in fact, this was impossible because the contracts where designed to result in a loss;

n.     Failing to disclose the actual roles of the Members of the Enterprise, including Deutsche Bank;

o.     Informing Plaintiff that the transactions were not "sham transactions" that would be ignored or disallowed for tax purposes;

p.     Advising, recommending, instructing, and assisting Plaintiff in engaging into a transaction which he was advised had business purpose and economic substance and made investment sense;

q.     Failing to advise that the transaction had no business purpose and no economic substance;

r.     Failing to reveal to Plaintiff the number of other participants in similar schemes;

s.     Failing to disclose to Plaintiff that if he filed tax returns claiming capital and ordinary losses based on the HOMER strategy, he would be liable to taxing authorities including the IRS for penalties and interest;

t.     Advising Plaintiff that the capital and ordinary losses created by the HOMER
       strategy were legitimate, proper, and in accordance with all applicable tax laws,
       rules and regulations;

u.     Representing and advising Plaintiff that the various entities formed to carry out
       the HOMER strategy had a business purpose as well as economic substance;

v.     Directing, instructing, and assisting Plaintiff in carrying out each of the steps of
       the HOMER strategy, including asking Plaintiff to sign authorizations and
       agreements;

y.     Failing to advise, recommend, and instruct Plaintiff to amend his tax returns,
       timely or otherwise;

x.     Advising Plaintiff that the tax strategies concocted by the Enterprise were valid
       and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44; and

y.     Enticing, recommending, advising, assisting and directing Plaintiff to enter into a
       transaction that, unbeknownst to Plaintiff, would be deemed abusive and improper
       and would be disallowed and held invalid by the IRS on the grounds that the
       transaction lacked economic substance, had no business purpose, was a "sham
       transaction," and violated the step transaction, sham transaction, and economic
       substance doctrines, despite the representations to the contrary in the tax legal
       opinions provided by the Enterprise.

173.   The Enterprise either knew or reasonably should have known its representations,
recommendations, advice, instructions, and opinions to be false, based on its Members' prior
experience with similar strategies which they had also promoted and which had been deemed

abusive by the IRS. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Plaintiff of the omissions as set forth herein, was negligent, grossly negligent, and reckless.

174. In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regarding the transactions at issue, Plaintiff paid exorbitant fees to execute the transaction, did not avail himself of alternative tax opportunities, filed federal and state tax returns that have been and/or likely will be deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend his tax returns.

175. But for the Enterprise's failure to meet the applicable standard of care and the intentional and/or negligent misrepresentations and material omissions described herein, Plaintiff would never have engaged the Enterprise for advice on the tax strategies concocted by the Enterprise, never would have engaged in those tax strategies, filed Federal and State tax returns that reflected deductions for capital and/or ordinary losses resulting from the tax strategies, failed to file amended returns for his 2001 year end taxes and/or failed to avail himself of other alternative tax opportunities.

176. After discovering the Enterprise's wrongdoing, Plaintiff incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

177. As a result of the Enterprise's conduct set forth herein, Plaintiff suffered injury in that he, among other things: 1) paid to the Defendants and other Members of the Enterprise exorbitant fees, 2) took undue financial risk, 3) likely will incur tax penalties and interest, 4) has

incurred opportunity costs; 5) has and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, 6) has incurred reputation damage, and 7) has foregone alternative tax opportunities.

## DAMAGES

178.    As a proximate cause of the Enterprise's violation of 18 U.S.C. §§1962(a) - (d), Plaintiff has been injured in his business or property for the reasons described herein and because he was forced to expend a substantial amount of money in fees to the Enterprise for the false and fraudulent advice, and has paid and continues to incur substantial additional costs and expenses for engaging attorneys, tax attorneys, accountants and experts in an attempt to rectify the wrongs perpetrated against them.

179.    The Enterprise has exposed Plaintiff to substantial additional tax liability, including interest and penalties, due to the filing of tax returns based on the Enterprise's illegal and/or abusive tax advice and its failure to advise Plaintiff to amend those returns.

180.    The Enterprise and its co-conspirators have caused Plaintiff to incur severe financial and business losses.

181.    As set forth herein, as a result of the conduct of the Enterprise and its co-conspirators, Plaintiff has suffered injury to his business and property in that he has paid to the Defendants and other Members of the Enterprise exorbitant fees and has incurred actual damages and losses in an amount to be proven at trial; likely will incur tax penalties and interest and disallowance of other certain deductions; has incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; and has foregone alternative tax and investment opportunities.

182.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to threefold the amount of actual damages suffered by him due to the actions of the Enterprise.

183.    Plaintiff is also entitled to be awarded the costs incurred in this suit, pre judgment interest, reasonable attorneys' fees and all other damages authorized by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for relief as follows:

a.    As to the RICO claim, a judgment in favor of Plaintiff against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus treble damages, attorneys' fees, interest and costs;

b.    As to the Declaratory Judgment and Unjust Enrichment claim, an order on behalf of Plaintiff entering the declaratory relief prayed for herein, together with the return to Plaintiff all amounts by which Defendants have been unjustly enriched;

c.    As to the Breach of Fiduciary Duty claim, a judgment in favor of Plaintiff against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus attorneys' fees, interest and costs;

d.    As to the Fraud claim, a judgment in favor of Plaintiff against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs, and return of all monies paid by Plaintiff, plus punitive damages in an amount of not less than $20,000,000;

e.    As to the Negligent Misrepresentation claim, a judgment in favor of Plaintiff against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

f.   Awarding Plaintiff disgorgement and/or other remedial relief;

g.   Allowing a trial by jury to the extent permitted by law;

h.   Awarding Plaintiff pre-judgment and post judgment interest, as well as their

reasonable attorneys' fees, expert witness fees, and other costs; and

i.   Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York
       December 21, 2005

Respectfully submitted,

WOLF POPPER LLP

By: _____
    Lester L. Levy (9956)
    Emily Madoff (8407)
    James Kelly-Kowlowitz
    845 Third Avenue
    New York, New York 10022
    Tel. (212) 759-4600

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CLAUDE M. PENN JR.,

                Plaintiff,

      v.

JP MORGAN CHASE & CO., JEFFREY T. CONRAD,
JOHN B. OHLE, III, SCOTT D. DEICHMANN, and
BARBARA DAIGLE,

                Defendants.

No. 05-cv-5481(WHP)(RLE)

AFFIDAVIT OF
SERVICE BY MAIL

STATE OF NEW YORK    )
                         )    ss.:
COUNTY OF NEW YORK  )

CHRISTOPHER DUNLEAVY, being duly sworn, deposes and says:

I am over the age of 18 years of age and am not a party of the within action; on the 21th

day of December, 2005, I caused the attached SECOND AMENDED COMPLAINT, to be served

by mailing a copy thereof with the proper postage affixed and by depositing the same in an

official depository of the United States Postal Department to the following:

Thomas M. Durkin
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606

*Attorneys for Defendants JPMorgan*
*Chase & Co. and Barbara Daigle*

- and -

Doc. 150994

David J. Stetler
Stetler & Duffy, Ltd.
11 South LaSalle Street
Suite 1200
Chicago, Illinois 60603

*Attorneys for Defendants Jeffrey T. Conrad,*
*John B. Ohle, III, Scott D. Deichmann*

_____
CHRISTOPHER DUNLEAVY

Sworn to before me this
21th day of December, 2005

_____
Notary Public

ROSEMARY V. DIAZ
NOTARY PUBLIC, State of New York
No. 01DI6124621
Qualified in New York County
Commission Expires Mar. 28, 20__